**Mike AUSTFORD, Plaintiff and Respondent,**

v.

**Ardell M. SMITH and Tasco, Inc., Defendants and Respondents, and William Clairmont, Inc., Defendant and Appellant.**

**Civ. No. 8769.**

Supreme Court of North Dakota.

March 28, 1972.

Rehearing Denied May 1, 1972.

Rausch & Chapman, Bismarck, for defendant and appellant.

DePuy, Fair & O'Connor, Grafton, for plaintiff and respondent.

ERICKSTAD, Judge.

The defendant William Clairmont, Inc., appeals from a judgment obtained by Mike Austford against it, Ardell M. Smith, and Tasco, Inc., on the 20th of August 1970, in the sum of $6,967.75 plus interest and costs. Trial de novo is demanded. The defendants Ardell M. Smith and Tasco, Inc., have not appealed.

As William Clairmont, Inc., is owned by William Clairmont, we shall hereinafter refer to William Clairmont, Inc., as Clairmont; and as Tasco, Inc., is owned by Ardell M. Smith, we shall hereinafter refer to those defendants in the singular as Smith.

The basic issue in this case is whether Clairmont is indebted to Austford for the use of Austford's machinery on that part of the Forest River Watershed Project in Walsh County known as LFR–3, for a period of time extending between June 20, 1968, and October 17, 1968, the machinery consisting mainly of a D–8 14A crawler tractor with dozer.

Smith had entered into a subcontract on this project with Clairmont and in connection therewith had arranged for the rental of this machinery from Austford. When

Clairmont learned that Austford was going to supply Smith with machinery on the project, he sent the following letter, dated June 19, 1968, through his office manager, Ron Reiswig, to Austford:

"We have been informed by Ardell Smith that he will be renting two D–8's from you at the rent of $17.00 an hour. We will in no way guarantee the rental on this equipment. If there is money left after other project bills are paid, you will receive your rent. If there is not enough money, then you will have to do your collecting from Ardell Smith.

"We have no objection to your putting your machines to work on the job, but it would have to be on the basis that you will only be paid if there is money available after other bills are paid."

After receipt of this letter and after not being paid for the use of his machinery, Austford withdrew his machinery from the project on July 12, 1968. Fuel for the tractor and the wages of the operator apparently were paid by Clairmont.

On August 22, 1968, Willard DeKrey, the president of the Grafton National Bank, from his office in the bank placed a telephone call in the presence of Austford to Mr. Clairmont at Bismarck. Mr. De-Krey testified in essence that Mr. Clair-mont told him over the telephone that if a statement could be obtained from Smith in writing that Austford should be paid for the use of his machinery ahead of Wage-ner, who apparently had supplied machin-ery on this project or another project, Clairmont would see that Austford was paid for the use of his machinery.

A part of Mr. DeKrey's testimony rela-tive thereto reads:

" 'If Mike [Austford] gets this signed by Ardell [Smith], then I will see that Mike gets paid for the work on the job and you can tell him to go ahead.' "

Mr. Clairmont had a different view of the conversation. He testified as follows:

"A He asked me if I had any objection to his working on the project. I said, 'No, I didn't under the circumstances he was there before.' Then the conversa-tion came to if we could get—if Mr. DeKrey and Austford and Mr. Smith could get a release from Wagner, since Wagner at that time was of some con-cern to the project as one dragline. If they could get it it would put Austford ahead. He said, 'No, it would give Austford a chance to be paid.'

"Q. Is that the substance of the conver-sation?

"A. Yes, as I remember it."

Mr. DeKrey further testified that he took notes while Mr. Clairmont was speaking to him over the telephone as to the state-ment that Mr. Clairmont wanted him to obtain from Smith, and that he read this back to Mr. Clairmont and that Mr. Clair-mont agreed that that was the statement that Mr. Clairmont wanted Mr. Smith to sign. Mr. DeKrey then testified that he had this statement typed and that it was then given to Austford so that he could obtain the signature of Mr. Smith.

Austford testified that he obtained Smith's signature and forwarded the state-ment to Clairmont shortly thereafter. The statement signed by Smith reads:

"I hereby state that all local obligations pertaining to the Walsh County Water Management District project, which I am engaged in, will be paid first. If there are not sufficient funds left over to pay L. H. Wagener Inc., he will not be paid."

It is obvious that this so-called release did not constitute the release which Mr. Clairmont testified he requested; but not-withstanding this fact, when this release was obtained by Clairmont he made no ef-fort to contact Austford or DeKrey or Smith to so inform them, and Austford was permitted to return his machinery to the project, where it was used until that

particular part of the project for which it was to be used was accomplished.

On January 8, 1969, in a letter to Austford, Ron Reiswig, Clairmont's office manager, among other things unrelated to this issue said: "We will pay you for the work you did for Tasco as soon as the Walsh County Water Management District pays us for the work done."

During the trial, Reiswig testified that the Management District had paid Clairmont in full except for approximately $17,000 which the Management District held back because of this and two other pending lawsuits.

We think that the first and perhaps the critical issue in this lawsuit is whether the trial court erred in receiving in evidence the testimony of Mr. DeKrey relative to the telephone conversation which he asserted he had with Mr. Clairmont. Clairmont contends that this testimony was inadmissible under Section 9-06-04, Subsection 2, and Section 22-01-04, N.D.C.C., which he asserts requires a guaranty to be in writing to be enforceable.

"9-06-04. Contracts invalid unless in writing—Statute of frauds.—The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by his agent:

\* \* \* \* \* \*

"2. A special promise to answer for the debt, default, or miscarriage of another, except in the cases provided for in section 22-01-05;"

"22-01-04. Guaranty to be in writing—Exception—Consideration need not be expressed.—Except when a guaranty is deemed an original obligation as provided in section 22-01-05, a guaranty must be in writing and signed by the guarantor, but the writing need not express a consideration."

The pertinent part of Section 22-01-05 reads:

"22-01-05. When a guaranty need not be in writing.—A promise to answer for the obligation of another in any of the following cases is deemed an original obligation of the promisor and need not be in writing:

\* \* \* \* \* \*

"2. When the creditor parts with value or enters into an obligation in consideration of the obligation in respect to which the promise is made, in terms or under circumstances which render the party making the promise the principal debtor and the person in whose behalf *it is made his surety;*"

A similar issue was raised in Glock v. Hillestad, 85 N.W.2d 568 (N.D.1957). In that case, as in the instant case, the party alleged to have made the oral promise to pay the debt of another denied the oral conversations that were attributed to him. *Trying the case anew, this court, notwithstanding the denials, found the oral promise in Glock to be an exception to the statute of frauds under Subsection 2 of Section 22-0105, N.D.R.C.1943.*

In *Glock,* we adopted an approach suggested by a Pennsylvania decision.

" 'It is difficult, if not impossible, to formulate a rule by which to determine in every case whether a promise relating to the debt or liability of a third person is or is not within the statute; but, as a general rule, when the leading object of the promise or agreement is to become guarantor or surety to the promisee, for a debt for which a third party is and continues to be primarily liable, the agreement, whether made before or after, or at the time with the promise of the principal, is within the statute, and not binding unless evidenced by writing. *On the other hand, when the leading object of the promisor is to subserve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, his promise is not within the statute.' "*

[Emphasis added.] Glock v. Hillestad, 85 N.W.2d 568, 575 (N.D.1957).

Syllabus ¶4 of *Glock* reads:

"4. When the principal object of a promisor is to subserve some object of his own, notwithstanding the effect is to pay or discharge the debt or obligation of another, his promise is an original obligation and is not within the statute of frauds." Glock v. Hillestad, 85 N.W.2d 568, 570 (N.D.1957).

 Applying this rule to the instant case—and in light of the previous practice on the part of Clairmont of paying Smith's obligations in connection with his subcontracts with Clairmont, including the rental of machinery, the wages of the operator of the machinery, and the fuel bills in connection with the machinery—and in light of the letter sent by Clairmont's office manager to Austford to the effect that Clairmont would pay him for the work he did for Smith when the project was completed—we conclude that the trial court was correct in ordering judgment for the plaintiff.

Having made this decision, we find it unnecessary to discuss the other issues raised by the appellant, inasmuch as the judgment is sustainable on this basis.

For the reasons stated in this opinion, the judgment of the trial court is affirmed.

STRUTZ, C. J., and TEIGEN, PAULSON and KNUDSON, JJ., concur.