STATE BANK OF TOWNER, INC., Plaintiff and Appellee,

v.

J. T. RAUH, Defendant, Third-Party Plaintiff and Appellee,

v.

PIONEER CREDIT COMPANY, INC., Robert E. Larson, Individually Third-Party Defendants and Appellees,

and

Hayden Thompson, Individually and as agent for Plaintiff State Bank of Towner and Third-Party Defendant Pioneer Credit Company, Third-Party Defendant and Appellant.

PIONEER CREDIT COMPANY, INC., Plaintiff and Appellee,

v.

J. T. RAUH, Defendant, Third-Party Plaintiff and Appellee,

v.

STATE BANK OF TOWNER, INC., Robert E. Larson, Individually, Third-Party Defendants and Appellees,

and

Hayden Thompson, Individually and as agent for Plaintiff Pioneer Credit Company, Inc., and Third-Party Defendant State Bank of Towner, Inc., as assignee of Pioneer Credit Company, Inc., Third-Party Defendant and Appellant.

Civ. No. 9651 and 9652.

Supreme Court of North Dakota.

Jan. 24, 1980.

Rehearing Denied Feb. 14, 1980.

Farhart, Rasmuson, Lian & Maxson, Minot, for third-party defendant and appellant Hayden Thompson; argued by Gary R. Sorenson, Minot.

Pringle & Herigstad, Minot, for plaintiff and appellee State Bank of Towner and third-party defendant and appellee. Pioneer Credit Co; argued by Richard P. Olson, Minot.

Pancratz, Kruger, Wold, Yuill & Johnson, Fargo, for defendant, third-party plaintiff

and appellee J. T. Rauh; argued by Robert A. Feder, Fargo.

SAND, Justice.

Hayden Thompson appealed from two separate judgments of the Ward County District Court and the subsequent denials by that court of Thompson's motions to alter or amend the judgments. The two cases were consolidated for trial and again on appeal. We affirm.

Robert E. Larson was a farmer and cattle feeder near Minot, North Dakota. Hayden Thompson was the president and principal stockholder of Pioneer State Bank in Towner, North Dakota, until 5 Aug 1975. He was also engaged in numerous business ventures which involved livestock. Larson and Thompson associated in numerous livestock endeavors and, in 1973, entered into a written agreement whereby the two embarked upon a cattle feeding enterprise which Thompson financed and Larson operated. The profits were to be divided equally between the two partners. This particular operation was contracted to terminate some time in 1974, but at trial Larson acknowledged a 1976 statement that he was not sure the Larson-Thompson partnership had ceased. Larson, however, indicated that the partnership appeared to have ceased by the time of trial in this action, because Thompson was no longer providing Larson with financing.

Between 1973 and 1975, the Larson-Thompson feeding operation had incurred substantial losses, and as a result Larson became indebted to Thompson in the sum of $250,000. Larson was also substantially indebted to Thompson's bank, Pioneer State Bank, and its subsidiary, Pioneer Credit Company. Because of these large debts, Larson's line of credit at the two financial institutions was cut off.

At the urging of Thompson, Larson approached J. T. Rauh, a Minot, North Dakota, medical doctor, several times in early 1975 and attempted to get Rauh involved in Larson's cattle feeding operation, but Rauh resisted each time. Then, on 24 June 1975, a meeting was held at Rauh's home with Rauh, Larson, and Thompson in attendance. Again, the purpose of this meeting was to persuade Rauh to become involved in the Larson cattle feeding operation in order to generate additional capital needed to keep the feedlot operating. Thompson spent several hours explaining his problems in financing Larson due to his position at Pioneer State Bank and how Rauh's assistance was needed. Thompson told Rauh about his ownership of Pioneer State Bank and Pioneer Credit Company, and disclosed that he was worth many millions of dollars. Rauh testified:

"I was led to believe that these two fellows were using my credit in their partnership to raise and feed and sell cattle. They had established a partnership, they sustained some losses, and they needed somebody with a fresh, untarnished, credit to use to obtain the credit, to profit from the market when it was good. That is what they told me, it was not what I was led to believe. That is what they told me. . . ."

Larson and Thompson proposed that Rauh borrow $400,000 from Pioneer State Bank and Pioneer Credit Company to be used to purchase 1,000 head of feeder cattle and feed to "finish" the cattle. Larson was to feed and care for the cattle which would be sold in a transaction monitored by Thompson for a sizable profit. When Rauh requested a written guarantee, the following note was handwritten by Thompson, and signed by Larson and Thompson:

"Agreement

"This agreement is dated this 24th day of June, 1975, between Hayden Thompson, Towner, N. D; Robert Larson, Minot, N. D., and Jay T. Rauh, Minot, N. D. The parties agree to the following:

1. Thompson and Larson guarantee to Rauh a return of 16% annual net return based on the principal borrowed for the number of days the money is used.

2. Rauh anticipates purchasing approximately 1000 head of 750 # to 950 # feeder cattle to be placed in Larson's feedlot and Larson and Thompson agree to see that these cattle are hedged

at a profit with the Mercantile Commodity Exchange or a major packer. H Thompson and Larson further guarantee to Rauh that they will absorb any loss that may be incurred on these cattle

S/ ROBERT E. LARSON

S/ HAYDEN THOMPSON"

Rauh subsequently submitted a loan application for the cattle feeding enterprise and, upon its acceptance by Pioneer State Bank, borrowed $135,000 from Pioneer State Bank and $265,000 from Pioneer Credit Company. Larson purchased the cattle with his personal check and gave Pioneer State Bank a receipt for the price paid. The bank debited Rauh's escrow account and credited Larson's checking account for the amount sufficient to cover the purchase price. Larson then fed, cared for, and sold the cattle without any assistance from Rauh. The proceeds of the sale were deposited at Pioneer State Bank and applied on the Rauh loans. On 27 Dec 1975, Rauh received a check from Larson for $5,808.81. Rauh understood this money to be his guaranteed "profit" from the sale of cattle by Larson throughout the fall and early winter of 1975.

Because the initial Rauh cattle feeding investment was a financial success, Larson was anxious to get Rauh involved in a follow-up venture. Larson told Rauh that the cattle market looked good and that he wanted to get more cattle in the feedlot. Larson suggested the same kind of Rauh credit arrangement with Pioneer State Bank and Pioneer Credit Company. Rauh declined Larson's invitation to invest again, and stated that any income he realized would be treated as "ordinary income" for taxation and would serve him no useful purpose because he already had a sizable annual income from his medical practice.

On 27 Dec 1975, another meeting was held between Rauh, Larson, and Thompson. Thompson had by that time sold his interest in Pioneer State Bank and was no longer the bank's president, but Rauh testified that he was ignorant of these facts until a later date. The meeting lasted approximately two hours, most of which was spent by Thompson explaining to Rauh what was and was not possible to do in the livestock industry with taxes. Thompson advised Rauh that if Rauh invested in a second cattle feeding venture, the income used to purchase feed could be deferred from taxation until the following year if Rauh this time personally wrote checks for cattle feed. Thompson then produced a livestock feeding contract, a checkbook, two notes in the total sum of $400,000, and some articles relating to the tax consequences of feeding operations.

Before Rauh committed himself a second time he wanted assurances that the arrangement between the parties was the same. Rauh, being questioned at trial by his attorney, testified as follows:

"Q Did you ask Bob Larson if this was the same deal?

"A Yes.

"Q And what did he say?

"A He said, 'Yes.'

"Q Did you ask Hayden Thompson if it was the same deal?

"A I asked him directly across the table if it was the same deal and if he was personally guaranteeing this and he told me directly, 'Yes' he was."

Larson testified similarly when questioned by Rauh's attorney:

"Q Now, did Dr. Rauh at this time indicate he would go again if the same things happened the second time as happened the first time? In other words, he wanted to go again on the same terms and same conditions?

. . . . .

"A In essence that was the question Dr. Rauh asked me.

"Q If it would be the same as before?

"A Right.

"Q Yes. And what did you respond?

"A Specifically, Dr. Rauh said to me, 'Will this be the same deal?' and I said, 'Yes.'

"Q Meaning what?

"A As far as I am concerned, I was guaranteeing the repayment of that

loan, myself, and that I was also guaranteeing him the profit we had spoke of in the previous deal.

"Q Did Mr. Thompson say, 'No, it is not the same deal'?

"A No, he did not."

The guarantees testified to by Rauh and Larson concerning a second investment were never written, and Thompson denied that either he or Larson was asked "if it was the same deal."

Rauh agreed to participate in the second cattle feeding venture using his credit to obtain loans of $400,000 to purchase 1,000 head of feeder cattle and feed. He executed a note of $135,000 to Pioneer State Bank and a note of $265,000 to Pioneer Credit Company. Rauh also executed a "feeding contract" with Larson on 27 Dec 1975 to give him an advantage in deducting feed costs for tax purposes.

In Jan of 1976 the cattle market appeared to be on the upswing and Rauh and Larson decided to use the entire proceeds of the loans to purchase cattle, with the expectation that Larson had sufficient feed on the lot to feed the cattle until spring. A total of 1,682 head of cattle were bought by Larson, and Rauh paid Larson for them by check.

In May 1976 Larson sold some of the cattle to raise money to feed those remaining, but things did not go well. The cattle market went down, and Larson's financial troubles increased. He began selling more cattle, but because the Rauh cattle were intermingled with other cattle in the feedlot, problems arose as to whose account the proceeds were to be credited.

In Oct 1976 Larson informed Rauh that the Pioneer State Bank officials were not applying the proceeds from the sale of his cattle toward the payment of Rauh's loan. Larson became insolvent and his feedlot operations stopped. On 24 Nov 1976 Pioneer State Bank wrote Rauh advising him that his loan was past due and requested Rauh to sell some of the cattle. However, Rauh was not concerned about this at the time because of the oral guarantee against his personal loss by Larson and Thompson.

To further complicate matters, on 26 Nov 1976, Pioneer State Bank was closed for insolvency. The State Bank of Towner was chartered, and opened in Mar 1977. It assumed Pioneer State Bank's deposits, liabilities, and purchased most of its assets, including Rauh's note and ownership of Pioneer Credit Company.

On 5 Apr 1977 the State Bank of Towner and Pioneer Credit Company sued Rauh in separate actions for the balances due on the notes. Rauh defended, answered, and counterclaimed. On 27 Apr 1977, Rauh served third-party complaints in both of the actions upon Thompson and Larson seeking enforcement of their guarantees. Larson, however, filed bankruptcy on 23 Sept 1977 and was thereafter only a witness and not an active party. Larson still owed Thompson $250,000 when he filed bankruptcy.

After the commencement of the third-party actions, Larson, Rauh, Pioneer Credit Company, and Pioneer State Bank agreed that two checks totaling $143,926.12 be placed in an interest-bearing account. One of the checks was payable to Larson, Rauh, Pioneer State Bank and Pioneer Credit Company in the amount of $127,596.86, and the other was payable to Larson, Rauh, and Pioneer State Bank in the amount of $16,329.26. Subsequently, Rauh, Pioneer Credit Company, Pioneer State Bank, and State Bank of Towner entered into an agreement whereby they agreed to a division of the check funds.

The two actions were consolidated for trial, and the district court issued a partial memorandum opinion covering both cases and later a final memorandum opinion again concerning both cases. The relevant, summarized findings of fact of the district court were: (a) On 27 Dec 1975 Larson and Thompson agreed to again guarantee to Rauh that he would not suffer a loss by signing the notes and checks, (b) that Larson had a vital and pecuniary interest in the second cattle feeding venture and that, therefore, Thompson's oral guarantee was not within the statute of frauds, (c) Rauh did not have personal knowledge of the fact

that Thompson was no longer president of the financial institutions on 27 Dec 1975, (d) Thompson was an agent of the bank and credit company and was acting in behalf of these institutions on 27 Dec 1975, and (e) Thompson had no agency authority on behalf of the financial institutions to enter into a guarantee on 27 Dec 1975.

The court granted judgment in favor of the State Bank of Towner and against Rauh for $21,135.48, with directions for its payment out of Rauh cattle proceeds of $119,459 which were being held in trust pending litigation.

The court granted judgment in favor of Pioneer Credit Company for $337,865.55 against Rauh, less credit for the balance of the held proceeds of Rauh's cattle, for a net judgment of $239,342.29.

The court also granted judgment in favor of Rauh and against Hayden Thompson on his third-party complaint in the amount of the Pioneer Credit Company judgment after the credit, $239,342.29. Thompson moved to alter or amend the judgments, but the district court denied the motions on 25 Apr 1979.

Thompson appealed from both judgments, and from both orders denying amendment of the judgments. The consolidated appeals claimed procedural and factual errors by the district court, as well as errors of law in holding Thompson liable to Rauh on his oral guarantee.

A number of issues were presented on appeal.

Thompson contended that the issue of Thompson's oral guarantee to Rauh on the second cattle feeding venture was not properly before the district court because it was not raised in the pleadings nor tried with Thompson's consent.

The North Dakota rules of pleading require only that the complaint apprise the defendant of the nature of the plaintiff's claim. *Jacobsen v. Pedersen*, 190 N.W.2d 1 (N.D.1971). Rule 8(a) of the North Dakota Rules of Civil Procedure provides as follows:

*"Claims for Relief.* A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief to which he deems himself entitled. Relief in the alternative or of several different types may be demanded."

Thompson asserted that Rauh's third-party complaint did not adequately notify Thompson that the issue of an oral guarantee was to be determined by trial.

Rauh's third-party complaint against Thompson contained the following material allegations:

"II.

"That on approximately June 24, 1975, Third-Party Defendants Larson and Thompson came to Defendant and Third-Party Plaintiff Rauh requesting Rauh assist them in the borrowing of some money for which the *Third-Party Defendants Larson and Thompson guaranteed a return of a certain percentage of money to Rauh and further guaranteed to Rauh that they would absorb any loss that may be incurred as a result of the loan. A copy of said agreement is attached hereto as Attachment B.*

"III.

"Subsequently, on approximately December 27, 1975, Third-Party Defendant Larson gave Third-Party Plaintiff Rauh approximately Five Thousand Seven Hundred Sixty and no/100 Dollars ($5,760.00) pursuant to the agreement referred to as Attachment B.

"IV.

"Third-Party Defendant Larson then, along with Third-Party Defendant Thompson, requested Third-Party Plaintiff to sign another note in blank which *was to be governed by the same terms and conditions as the previous note referred to as Attachment B* and the Third-

Party Defendant Thompson, individually and as and for an agent of the Pioneer Credit Company, Inc., did produce said note and Defendant and Third-Party Plaintiff Rauh signed same in blank *with the understanding that it was to be governed by the same terms and conditions as the first agreement referred to as Attachment B.*" [Emphasis supplied.]

■ There was no specific allegation in the third-party complaint that Thompson made an oral guarantee to Rauh that Larson and Thompson would absorb any loss which might occur in the second cattle feeding venture. However, the complaint specifically alleged that the request by Larson and Thompson for a second Rauh investment was "governed by the same terms and conditions as the previous note." The complaint specifically alleged that the first cattle investment was entered into by Rauh under an agreement which "guaranteed to Rauh that [Larson and Thompson] would absorb any loss that may be incurred as a result of the loan." Thompson, therefore, knew that the terms and conditions of the agreement were in issue in the lawsuit. Because Thompson's guarantee was a term or condition of the Thompson-Rauh agreement, we think that Rauh's third-party complaint was sufficient to apprise Thompson that the oral guarantee was to be determined at trial. The requirements of Rule 8(a), NDRCivP, were satisfied in this case.

Thompson next urged that the trial court committed clear error in finding as a fact that an oral contract or guarantee existed between Thompson and Rauh.

■ Rule 52(a), NDRCivP, provides that the trial court's findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. In applying this rule, we will set aside the findings of the trial court only if they are found to be clearly erroneous based upon all the evidence, and not merely because we might have reached a different result. *Anderson v. Mooney*, 279 N.W.2d 423 (N.D.1979); *Kee v. Redlin*, 203 N.W.2d 423 (N.D.1972).

Rauh testified at trial that at the 27 Dec 1975 meeting he asked Thompson whether the second deal was exactly like the first, and received a positive response from Thompson. Thompson denied that he made any such statement to Rauh. Larson acknowledged Rauh's question and interpreted the second deal to mean that repayment of the Rauh loan was guaranteed, as was Rauh's profit. Larson further stated that Thompson never said the second transaction would not be the same deal as the first.

■ The district court found from this conflicting testimony that Thompson, in response to a Rauh question if the second deal was exactly like the first, either stated "yes" or acquiesced affirmatively to the statement by silence. This formed the basis of the district court's finding of fact that Thompson guaranteed Rauh against losses in the second transaction. We think the district court had sufficient evidence before it to support its findings that an oral guarantee existed between Thompson and Rauh on the second cattle feeding venture, and this finding of fact was therefore not clearly erroneous.

Thompson further contended that the agreement upon which Thompson's oral guarantee was based was so unduly uncertain and indefinite that a valid contract was not formed.

The general rule, found at 38 C.J.S. *Guaranty* § 16 (1943), is as follows:

" . . . if the principal contract, for reasons inherent in itself, is invalid, the guaranty partakes of the character of the principal contract, and is also invalid, particularly where the principal contract and the guaranty thereof are parts of one entire transaction so that there is as a matter of fact only one contract."

Accordingly, if the principal contract between Rauh and Larson was invalid then Thompson's guarantee was also invalid and Thompson was exonerated of any liability to Rauh on the oral guarantee. Thompson quoted § 9–04–03, NDCC, to support his assertion of the principal contracts' invalidity. That statute provides as follows:

"*Unlawful, impossible, or unascertainable object voids contract.—When a contract has but a single object, and such object is* unlawful in whole or in part, or wholly impossible of performance, *or so vaguely expressed as to be wholly unascertainable, the entire contract is void.*" [Emphasis added.]

We do not agree with Thompson's claim that the contractual object of the second Rauh cattle investment was unascertainably vague.

At the 27 Dec 1975 meeting between Rauh, Larson, and Thompson, Rauh agreed to participate in a second cattle feeding venture using his credit to obtain loans of $400,000 to purchase 1,000 head of feeder cattle and feed. At that time, all three men knew the substance of the agreement: Rauh would write checks on his personal account to purchase the cattle and feed in order to gain a tax advantage, Larson would feed and care for the cattle at his feedlot, and the "finished" cattle would be sold, hoping to yield a sizable profit. We conclude that the cattle feeding investment agreement upon which the oral guarantee from Hayden Thompson to Rauh was based was not so unduly uncertain and indefinite as to prevent the formation of a valid contract.

Thompson, however, contended that oral guarantee to Rauh was invalid because the obligation upon which it was based was unlawful in that Rauh used the transaction as a means of evading taxes.

One of the requisites to a lawful contract in North Dakota is that the agreement must have a lawful object. Section 9–01–02, NDCC. Unlawful provisions in a contract are defined in § 9–08–01, NDCC, as follows:

"Any provision of a contract is unlawful if it is:

1. Contrary to an express provision of law;

2. Contrary to the policy of express law, though not expressly prohibited; or

3. Otherwise contrary to good morals."

The object of the contract underlying Thompson's oral guarantee was to purchase, feed, and later sell cattle in order to secure a profit. Rauh's primary motivation for the second cattle feeding venture was to save himself approximately $25,000 in 1975 income taxes and to gain additional tax advantages by developing a breeder herd upon which he could realize long term capital gain. On the basis of these facts, Thompson contended that Rauh never intended to own any of the cattle involved in the second transaction and that he therefore entered into the transaction only as a subterfuge to evade payment of income taxes. This, Thompson maintained, was contrary to the policy of expressed law and contrary to good morals and, therefore, the contract including the oral guarantee to Rauh was invalid under the provisions of § 9–08–01, NDCC, and as a result Thompson was exonerated of any liability to Rauh based upon the oral guarantee.

We do not think the statutory principles of law cited by Thompson in his argument have proper application to the facts of this case. The rationale of this court is set out in *Beck v. Lind,* 235 N.W.2d 239 (N.D.1975). The *Beck* litigation was initiated by a ranchland lessor against his lessee for cancellation of the remaining term of the lease and for additional rents due for damages to the property caused by the lessee. A relevant issue in *Beck* was whether or not the payment of certain sums to the lessor *as rent rather than as wages* in order to avoid required social security contributions rendered the personal services contract illegal. Our court reasoned that because the contract of employment for performing a lawful personal service was not per se illegal, the question of illegality arose from the method and manner of payment as distinguished from the basic contract. Therefore, if a contract for lawful personal services was entered into by the parties, the contract or agreement was valid. 235 N.W.2d at 245.

The *Beck* court also recognized that internal revenue laws provide ample punishment

for the evasion of taxes or contributions. With this in mind, the court approved the rationale of *Crowns v. Forest Land Company,* 99 Wis. 103, 74 N.W. 546 (1898), a Wisconsin case involving a note and mortgage given for purposes of evading taxation:

> "When the revenue laws provide ample punishment for the evasion by taxpayers of their just dues, it would seem a monstrous injustice to permit a mortgagor to defeat the payment of his debt by bringing any such issue into a suit brought to foreclose his mortgage. The alleged turpitude of the mortgagee furnishes no ground for the discharge of the mortgagor from the payment of his just debt." *Beck v. Lind,* 235 N.W.2d 239, 245–246.

■ In the instant case, there was nothing inherently illegal in the contract to purchase cattle, feed, and sell cattle. If the contract, however, was a facade to merely evade taxes, we believe the internal revenue laws have ample provisions for the imposition of appropriate penalties and punishment. Therefore, because the cattle feeding agreement was not in itself unlawful, Thompson's oral guarantee to Rauh was not extinguished because of possible underlying illegality.

■ In *Beck v. Lind, supra,* at 246, we said, "A rule of law in any event should not be applied so as to benefit the principal perpetrator of the violation." To this we add that we do not believe the law should come to the aid of a person who suggests or urges a transaction which may not be in harmony with or be in violation of law if the suggested transaction was to be for the benefit of the person making the suggestion, particularly if the law which later is claimed to have been violated provides for appropriate punishment or penalty for its violation.

■ Thompson urged the transaction which was for his benefit; he cannot now legally deny his liability thereunder.

Thompson, however, advocated that the oral guarantee found by the district court was unenforceable against him by reason of the statute of frauds. The pertinent provisions of the North Dakota Century Code are as follows:

> "9–06–04. *Contracts invalid unless in writing—Statute of frauds.*—The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by his agent:
>
> 1. . . .
>
> 2. A special promise to answer for the debt, default, or miscarriage of another, except in the cases provided for in section 22–01–05;
>
> 3. . . .
>
> 4. . . ."

> "22–01–04. *Guaranty to be in writing—Exception—Consideration need not be expressed.*—Except when a guaranty is deemed an original obligation as provided in section 22–01–05, a guaranty must be in writing and signed by the guarantor, but the writing need not express a consideration."

> "22–01–05. *When a guaranty need not be in writing.*—A promise to answer for the obligation of another in any of the following cases is deemed an original obligation of the promisor and need not be in writing:
>
> 1. When the promise is made by one who has received property of another upon an undertaking to apply it pursuant to such promise, or by one who has received a discharge from an obligation in whole or in part in consideration of such promise.
>
> 2. When the creditor parts with value or enters into an obligation in consideration of the obligation in respect to which the promise is made, in terms or under circumstances which render the party making the promise the principal debtor and the person in whose behalf it is made his surety.
>
> 3. When the promise, being for an antecedent obligation of another, is made upon the consideration that the party receiving it shall cancel the antecedent obligation and accept the new promise as a substitute therefor, or upon the consideration that the party

receiving it shall release the property of another from a levy under an execution on a judgment obtained upon the antecedent obligation, or upon a consideration beneficial to the promisor, whether moving from either party to the antecedent obligation or from another person.

4. When a factor undertakes, for a commission, to sell merchandise and guarantee the sale.

5. When the holder of an instrument for the payment of money upon which a third person is or may become liable to him transfers the instrument in payment of a precedent debt of his, or for a new consideration, and in connection with such transfer, enters into a promise respecting such instrument."

In the past, this court heard several cases in which the issue was whether or not the oral promise was an exception to the statute of frauds under § 22–01–05, NDCC. *Nokota Feeds, Inc. v. State Bank of Lakota,* 210 N.W.2d 182 (N.D.1973); *Austford v. Smith,* 196 N.W.2d 413 (N.D.1972); *Glock v. Hillestad,* 85 N.W.2d 568 (N.D.1957).

In *Glock,* the court adopted the following general rule as an aid in the determination of whether or not the oral promise was exempt from the writing requirement:

". . . when the leading object of the promise or agreement is to become guarantor or surety to the promisee, for a debt for which a third party is and continues to be primarily liable, the agreement, whether made before or after, or at the time with the promise of the principal, is within the statute, and not binding unless evidenced by writing. *On the other hand, when the leading object of the promisor is to subserve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, his promise is not within the statute."* [Emphasis added.] *Glock v. Hillestad,* 85 N.W.2d 568, 575 (N.D.1957).

Thus, if the principal or leading object of Thompson's oral guarantee to Rauh was to subserve some object of his own, notwithstanding the effect of paying or discharging the debt or obligation of Rauh, Thompson's promise was an original obligation and was not within the statute of frauds. *Nokota Feeds, Inc. v. State Bank of Lakota, supra; Austford v. Smith, supra; Glock v. Hillestad, supra.*

Thompson and Larson were close personal friends for many years, as well as partners in the cattle feeding business. As the result of partnership losses, Larson became personally indebted to Thompson in a principal amount of $250,000 but Thompson agreed not to collect the huge sum until Larson was financially able to repay it. Thompson genuinely had a $250,000 interest in Larson's economic recovery, and knew that he would not likely be paid if Larson was unable to continue the business.

■ It was obvious to both Thompson and Larson that new sources of capital were needed to operate the cattle feeding operation because of Larson's financial situation. Thompson suggested that Larson borrow money from Rauh and was closely involved in persuading Rauh to furnish the money. Thompson spent two hours on 27 Dec 1975 convincing Rauh to go along with the second transaction. We agree with the district court that the persuasion and influence of Thompson were not just acts of friendship to Larson. Thompson was vitally interested because of the very large amount of money that Larson owed him. We conclude, as did the district court, that the principal or leading object of Thompson's oral guarantee to Rauh was the protection of Thompson's interest as a creditor in the $250,000 debt of Larson and that, therefore, the oral guarantee was an original obligation and did not come within the statute of frauds.

Thompson also contended that material alterations in the obligation underlying his oral guarantee exonerated Thompson of any liability under that guarantee. NDCC § 22–01–15 provides in relevant part as follows:

*"When guarantor exonerated.*—A guarantor is exonerated, except insofar as he may be indemnified by the princi-

pal, if, by any act of the creditor without the consent of the guarantor:

    1. The original obligation of the principal is altered in any respect; . . .

    2. .. . ."

The obligations of Rauh and Larson with regard to the second cattle feeding venture were agreed upon at the 27 Dec 1975 meeting between Thompson, Larson, and Rauh. Under the terms of that agreement, Rauh was obligated to use his credit to obtain $400,000 to be used for the purchase of approximately 1,000 head of feeder cattle and feed. Larson's obligations under the agreement was to place the cattle on his feedlot, feed them, care for them, and arrange for their ultimate sale. With the single exception of Rauh personally drafting the checks to purchase cattle, the second venture agreed upon was "the same deal" as the initial Rauh investment.

At the time of this agreement, Thompson and Larson knew that Rauh would borrow the $400,000 from Pioneer State Bank and Pioneer Credit Company. The record clearly indicated that Thompson in fact had the loan application forms with him at the 27 Dec 1975 meeting and convinced Rauh to sign the notes at that time. Thompson and Larson then orally guaranteed to absorb any Rauh loss as was thoroughly discussed earlier in this opinion. Both Thompson and Larson knew at that time that any loss to Rauh on the venture would necessarily be the amount of Rauh's $400,000 loan from Pioneer State Bank and Pioneer Credit Company which remained unpaid after the cattle were sold. Thus, Thompson and Larson guaranteed that they would pay the balance of Rauh's note.

In an attempt to satisfy NDCC § 22–01–15, Thompson maintained that he was the guarantor, Larson was the principal obligor, and Rauh was the creditor. These classifications were arbitrarily assigned by Thompson and, with the exception of the assignment of Thompson as guarantor, had no basis in fact. On 27 Dec 1975 Thompson and Larson both agreed to absorb any Rauh losses in the venture and were therefore both guarantors under NDCC § 22–01–15.

Rauh was the principal obligor of the guarantee because it was his personal obligation to repay the $400,000 loan which formed the basis of the Thompson-Larson guarantee. Pioneer State Bank and Pioneer Credit Company were the creditors of the guarantee under the statute because it was the debt owed to these financial institutions which Thompson and Larson guaranteed. Therefore, applying the statutory provision to the circumstances of this case, Thompson was exonerated of his oral guarantee to Rauh if the obligations of Rauh were altered in any respect by Pioneer State Bank or Pioneer Credit Company without Thompson's consent.

The previous cases which discussed NDCC § 22–01–15 are consistent with our present application. In *Liberty National Bank & Trust Company v. Dvorak,* 199 N.W.2d 414 (N.D.1972), an action by the bank against the guarantor of a note, the guarantor was exonerated under NDCC § 22–01–15 because a second note was executed by the creditor bank and the principal which increased the debt and extended the terms of the monthly payments. Further, in *AMF, Inc. v. Fredericks,* 212 N.W.2d 834 (N.D. 1973) the lessor of bowling equipment brought an action as a creditor against the lessee and guarantors of the lease. The statute required that the guarantors be released from their obligation because the creditor altered the terms of the rental agreement and extended the period of the lease. In both of these cases the obligations of the principal were altered.

Thompson argued at length in his brief and again at oral argument that material alterations in the 27 Dec 1975 agreement which occurred after the meeting and without his consent exonerated him from his guarantee. The alterations recited by Thompson included the purchase of 1,682 head of cattle rather than the 1,000 head bought in the first cattle feeding venture, the use by Larson of the entire $400,000 to purchase cattle rather than the use of a portion of the money to purchase feed, the refinancing of some of the cattle so that additional feed could be purchased, and the

early sale of some of the cattle as feeder cattle rather than as fat cattle.

■ The obligations of Rauh, the principal in this case, were not altered in any respect after the agreement entered into by the parties. Rauh was obligated under the contract to use his credit to secure a $400,000 loan. This obligation was completely satisfied without alteration as soon as Rauh secured the loans from Pioneer State Bank and Pioneer Credit Company. The contractual obligations at that point shifted to Larson who was obligated to purchase, feed and sell the cattle under the 27 Dec 1975 agreement. Each of the subsequent obligation alterations listed by Thompson dealt directly with the purchase, feeding, or sale of cattle, and were alterations regarding the obligations of Larson under the agreement. Because Thompson's guarantee in this case was to Rauh, the principal under NDCC § 22–01–15, alterations to the obligations of Larson do not invoke the application of this statute, and therefore Thompson was not exonerated of liability based upon the oral guarantee.

The final contention was that the district court abused its discretion in not granting Thompson's motions to alter or amend the judgments.

In a post-trial proceeding, Thompson moved to alter or amend both judgments in two respects. First, Thompson requested that both judgments be changed to show that Larson was also liable to Rauh on the guarantee and to reflect judgments against Larson. Second, Thompson wanted that portion of both judgments which allowed credit of the $119,459 proceeds from the sale of Rauh cattle to be applied on both judgments stricken from the judgment. The grounds given by Thompson to support the motions were that the judgments were totally unrelated to the pleadings, the court's findings and the evidence adduced at trial.

■ The function of this court in reviewing a trial court's denial of a motion to vacate or amend a judgment is not to determine whether or not the trial court was substantially correct in entering its judgment, but to decide whether or not the trial court abused its discretion in refusing to disturb its judgment. *Small v. Burleigh County*, 239 N.W.2d 823 (N.D.1976); NDRCivP Rule 60(b).

■ With regard to Thompson's claim that the judgments in this matter should be amended to reflect Larson's indebtedness as well as his own, the federal bankruptcy law in effect at the time of the trial court's decision provided that judicial proceedings against one who has filed a voluntary petition in bankruptcy are stayed until the petition is adjudicated or dismissed. 11 U.S.C. § 29 [now 11 U.S.C. § 362]. Therefore, under the then existing federal bankruptcy law the suit could not proceed against Larson. Thompson's counsel recognized this at trial because he stated during a cross-examination of Larson that "this witness, Mr. Larson, is not a party to the action by reason of the bankruptcy petition." Under these circumstances, we do not believe that the district court abused its discretion in denying the motion by Thompson to insert Larson as a judgment debtor of Rauh.

We also think that the district court acted within its discretion when it denied Thompson's motions to strike those portions of the judgments which allowed credit of $119,459 to be applied on the judgments.

One of the major phases of the entire consolidated trial in this matter was the amount of credits deducted from and payments made on the Rauh notes. Much evidence was presented at the trial regarding the proper distribution of the proceeds of the two checks totaling $143,926.12 which had been placed in an interest-bearing account by Larson, Rauh, Pioneer Credit Company and Pioneer State Bank. Thompson's attorney was an active participant throughout the litigation of this issue.

After trial, the district court requested counsel in the case to assist him in deciding how the $143,926.12 should be divided up. The State Bank of Towner then submitted a stipulation agreement entered into by Pioneer State Bank, Pioneer Credit Company, State Bank of Towner and Rauh. The stip-

ulation provided for the "abandonment" of $171,022.36, which included the two checks involved in this appeal, held in various bank accounts by the trustee in the Larson bankruptcy. The stipulation further provided that 83% of these proceeds were attributed to the sale of Rauh cattle.

The memorandum opinion subsequently issued by the district court stated that careful consideration was given to the briefs of counsel, the exhibits received in evidence, and the testimony in court. From these sources of information the district court concluded that Rauh was entitled to have the escrow account money in the amount of $119,459 plus interest applied to the balance of his notes. This amount was approximately 83% of the total amount of the two checks. We think the district court was within its discretion to divide the proceeds of the two checks in accordance with the stipulation agreement of Pioneer State Bank, Pioneer Credit Company, State Bank of Towner, and Rauh.

For the reasons explained above, the decision of the district court is affirmed.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.