2014 ND 146

John N. FINSTAD and Lori L. Finstad, Plaintiffs, Appellants and Cross–Appellees

v.

RANSOM–SARGENT WATER USERS, INC., and/or Ransom–Sargent Water Users District, and/or Southeast Water Users District, and/or Southeast Water Users, and Jay Anderson, Scott Johnson, Don Lloyd, Don Smith, Larry Schultz and Patsy Storhoff, Defendants

Ransom–Sargent Water Users, Inc., and/or Ransom–Sargent Water Users District, and/or Southeast Water Users District, and/or Southeast Water Users, Appellees and Cross–Appellants.

No. 20130222.

Supreme Court of North Dakota.

July 17, 2014.

**166**

Bruce A. Schoenwald, Moorhead, MN, for plaintiffs, appellants and cross-appellees.

Michael T. Andrews, Fargo, ND, for appellees and cross-appellants.

CROTHERS, Justice.

[¶ 1] John and Lori Finstad appeal from a judgment awarding them $53,000.99 in damages and interest in their action against Ransom–Sargent Water Users, Inc., now known as Southeast Water Users District ("District"), for breach of the lease-back provisions of an option agreement between the parties. The District cross-appealed from the judgment. We conclude the district court erred as a matter of law in ruling the economic duress doctrine relieved the Finstads of their obligations under a subsequent agreement and release they had entered into with the District. Because the agreement and release is valid and enforceable, we reverse the judgment.

I

[¶ 2] The Finstads owned 80 acres of a section of land in Ransom County and leased 240 adjacent acres in the same section from Willis and Doris Olson. The District was considering this tract of land as a potential site to drill water wells. In 1997, the Finstads and the Olsons granted to the District options to purchase the land. The options also allowed the Finstads and the Olsons to lease back the property for five years, after which they had a nonassignable right of first refusal to lease back the property for an additional five years. The option provided:

"Seller may lease the property back from Buyer for five years after the option is exercised at the rate of $10.00 per acre, payable in advance each year. Seller shall thereafter have a nonassignable right of first refusal in regard to the succeeding five year rental period. "If leased back, Seller may only use the land for pasture and hayland purposes. No feedlots will be allowed, and the use of fertilizer and chemicals on said land will be prohibited unless Buyer gives explicit approval therefor.

"Any violation of the above-specified land use restrictions by the Seller/Tenant will result in immediate termination of the lease and the right of first refusal."

In early 2001, the District exercised its options to purchase the property from the Finstads and the Olsons. At the closing of the sale in May 2001, the Finstads and the Olsons asked the District's attorney to draft a document assigning the Olsons' lease-back rights to the Finstads, and the document was executed the same day. The Finstads expressed their desire to lease back the property. At this time, the Finstads were having financial difficulties and their land sale proceeds went directly to a bank to prevent foreclosure.

[¶3] The Finstads planned to seed alfalfa on the land for the 2001 growing season, and a week after the closing John Finstad tilled a portion of the land to prepare it for seeding. A representative of the District contacted the Finstads and told them to stay off the land because the District had not determined a management plan for the surface of the property. Shortly after this warning, the Finstads' hired man mistakenly tilled an additional 20 acres of the property. A District representative again confronted the Finstads and told them to stay off the property. Because it believed the two tilling incidents violated the land use restrictions contained in the options, the District in July 2001 voted to terminate the Finstads' lease-back rights on the property. The Finstads were informed of the decision by letter.

[¶4] After the lease was terminated, John Finstad told the District that to maintain government Freedom to Farm, or Production Flexibility Contract ("PFC"), payments on the property, a current lease must be in place or the payments would be lost for 2001 and thereafter. As a political subdivision, the District was not eligible to receive the payments so a rental agreement needed to be executed. Ultimately, the District's attorney prepared two agreements. The first was a "Farm Rental Contract–Cash Rent" purporting to allow John Finstad to farm the property during 2001 for $1,441. The parties admit this was an artifice to allow John Finstad to receive the PFC payments. The farm rental contract stated it was "subject to a separate Agreement and Release signed concurrently herewith," which was the second agreement involved in the transaction. The "Agreement and Release" provided in part:

"In consideration of Releasee executing a Cash Rent Contract on the date first listed above, granting to John Finstad the rental of the [subject property] and the right to collect all government payments available for 2001 because of said land, Releasors voluntarily and knowingly execute this Agreement and Release with the express intention of effecting the extinguishment of obligations as herein designated.

Releasors, with the intention of binding themselves, their heirs and assigns, expressly agree as follows:

1. As of the date hereof, their membership in Ransom–Sargent Water Users District shall be paid in full.

2. Releasors hereby release and discharge all rights they have to the [Finstads' former property] by reason of an Option to Purchase Real Property dated November 14, 1997, including all lease back rights and rights of first refusal contained therein.

3. Releasors hereby release and discharge all rights they have to the [Olsons' former property] by reason of an Assignment dated May 25, 2001 and signed by Willis L. Olson and Doris E. Olson.

4. Releasors specifically agree to remove all personal property owned by them which is now located on the [subject property] as soon as possible; provided, however, that they shall first contact Joel Heitkamp to advise him of the time for removal of said property.

5. Notwithstanding the Cash Rent Contract signed concurrently herewith, Releasors specifically agree that they will not enter upon any part of the [subject property] *for any reason*, from and after the date hereof, without the express permission of Joel Heitkamp."

[¶5] The Finstads continued experiencing financial difficulties during this period and the couple discussed the two con-

tracts before they signed them. John Finstad testified:

> "So when I took the two agreements home to my wife, like I said before, and I'm not going to go into detail, but we were under a lot of stress and I told my wife I have no strength for this. And my wife and I both agreed that rather than trying to fight the district and everything else that we didn't have the strength to do we turned around and we thought we'd just cooperate and try to preserve our rights to rent the land back at some point in time."

Before entering into the contracts, the District's attorney received the approval of the local FSA office. After the contracts were signed, John Finstad took them to the FSA office for approval and eventually received a $2,500 PFC payment. In 2003, the District advertised for bids for the right to lease the land, but rejected the bid offered by the Finstads even though it was higher than the accepted bid.

[¶ 6] In 2006, the Finstads sued the District and its board members, but the district court dismissed the action without prejudice because the Finstads had filed for bankruptcy. The Finstads recommenced the action in 2009, alleging the District violated the option agreement by cancelling their lease-back rights, the District obtained the agreement and release through fraud, duress or coercion and the District had wrongfully rejected their bid to lease the property. In *Finstad v. Ransom–Sargent Water Users, Inc.*, 2011 ND 215, ¶ 1, 812 N.W.2d 323, we reversed summary judgment dismissing the action, concluding the court erred in applying the three-year statute of limitations of N.D.C.C. § 32–12.1–10 to the Finstads' contract claims, and we remanded for further proceedings.

[¶ 7] Following a bench trial, the district court rejected the District's affirmative defense that the Finstads forfeited their lease-back rights and had no right to bring the action because of the agreement and release they signed in conjunction with the farm rental contract. The court found the agreement and release was "legally ineffective" because it was procured under economic duress. The court rescinded the agreement and release, found the Finstads had not breached the option to purchase agreement by tilling the land and found the District had breached the rental agreement contained in the option by not allowing the Finstads to exercise their lease-back rights. The court awarded the Finstads $53,000.99 in damages and interest for the District's breach of contract.

## II

[¶ 8] On appeal, the Finstads argue the district court erred by using the wrong measure of damages and by refusing to allow damages for the full 10–year term of the breached lease. It is unnecessary to address these issues because the dispositive issue, raised in the District's cross-appeal, is whether the court erred in rescinding the agreement and release based on the economic duress doctrine.

[¶ 9] Although not expressly adopted in North Dakota, the economic duress doctrine has been analyzed in several North Dakota cases going back many years. *See, e.g., Community Homes of Bismarck, Inc. v. Main*, 2011 ND 27, ¶ 16, 794 N.W.2d 204; *Bye v. Mack*, 519 N.W.2d 302, 305–06 (N.D.1994), *disapproved of on other grounds by Dan Nelson Constr., Inc. v. Nodland & Dickson*, 2000 ND 61, ¶ 15 n. 1, 608 N.W.2d 267; *Mellon v. Norwest Bank*, 493 N.W.2d 700, 702–04 (N.D.1992); *Production Credit Ass'n v. Geving*, 218 N.W.2d 185, 195–96 (N.D.1974). It has been unnecessary to decide whether to adopt the doctrine because in each case the person relying on economic duress had

not established its essential elements. This Court has said whether the facts amount to economic duress is a question of law, and one challenging the validity of a contract under the doctrine must establish: "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." *Mellon*, at 703 (internal citations omitted). In this case, we must determine whether North Dakota recognizes the economic duress doctrine.

[¶ 10] Under North Dakota's statutory framework, "consent of the parties" is one of the essential requisites to the existence of a valid contract. N.D.C.C. § 9–01–02(2). Consent for a contract must be "[f]ree." N.D.C.C. § 9–03–01(1). "An apparent consent is not real or free when obtained through . . . [d]uress." N.D.C.C. § 9–03–03(1). Duress is defined in N.D.C.C. § 9–03–05:

"Duress consists in:

1. Unlawful confinement of the person of a party to a contract, of the husband or wife of such party, or of an ancestor, descendant, or adopted child of such party, husband, or wife;

2. Unlawful detention of the property of any such person; or

3. Confinement of such person, lawful in form, but fraudulently obtained, or fraudulently made unjustly harassing or oppressive."

"A consent which is not free is not absolutely void, but may be rescinded by the parties in the manner prescribed by chapter 9–09." N.D.C.C. § 9–03–02. "A party to a contract may rescind the same . . . [i]f the consent of the party rescinding . . . was given by . . . duress . . . exercised by or with the connivance of the party as to whom the party rescinding rescinds. . . ." N.D.C.C. § 9–09–02(1).

[¶ 11] We recognize "most jurisdictions apply economic duress or business compulsion as a contractual defense or basis for rescinding contracts." 28 Richard A. Lord, *Williston on Contracts* § 71:7 (4th ed.2003) (footnote omitted); *see also* Wendy Evans Lehmann, Annotation, *Refusal to pay debt as economic duress or business compulsion avoiding compromise or release*, 9 A.L.R.4th 942, § 4[a] at 945–46 (1981). The Eighth Circuit Court of Appeals predicted this Court "would adopt the doctrine." *Jamestown Farmers Elevator, Inc. v. General Mills, Inc.*, 552 F.2d 1285, 1290 n. 5 (8th Cir.1977). We further recognize the Oklahoma Supreme Court interpreted its duress statute, which is identical to N.D.C.C. § 9–03–05, to encompass economic duress and the "evolving common law" that "is not limited by the early statutory and judicial expressions requiring an unlawful act in the nature of a separate tort or a crime." *Centric Corp. v. Morrison–Knudsen Co.*, 731 P.2d 411, 415 (Okl.1986) (footnote omitted).

[¶ 12] However, "[i]n this state there is no common law in any case in which the law is declared by the code." N.D.C.C. § 1–01–06. In *Bornsen v. Pragotrade, LLC*, 2011 ND 183, 804 N.W.2d 55, we refused to adopt the "apparent manufacturer" doctrine as part of North Dakota products liability law, explaining:

"The Legislature has informed us that '[t]he [North Dakota Century C]ode establishes the law of this state respecting the subjects to which it relates.' N.D.C.C. § 1–02–01. . . . We have recognized that 'it is for the legislature to determine policy, not for the courts.' *Doyle v. Sprynczynatyk*, 2001 ND 8, ¶ 14, 621 N.W.2d 353 (quoting *Treiber v. Citizens State Bank*, 1999 ND 130, ¶ 16, 598 N.W.2d 96). We have further noted that '[i]t must be presumed that the Legislature intended all that it said, and

that it said all that it intended to say.' *City of Dickinson v. Thress*, 69 N.D. 748, 755, 290 N.W. 653, 657 (1940).

"In *Vandall v. Trinity Hosps.*, 2004 ND 47, ¶¶ 14–15, 676 N.W.2d 88, we explained the standard for analyzing the potential coexistence of common law and statutory provisions under N.D.C.C. § 1–01–06:

"to mean that statutory enactments take precedence over and govern conflicting common law doctrines. *See Northern Pac. R.R. Co. v. Herbert*, 116 U.S. 642, 654, 6 S.Ct. 590, 29 L.Ed. 755 (1886); *In the Interest of M.C.H.*, 2001 ND 205, ¶ 9, 637 N.W.2d 678; *Hill v. Weber*, 1999 ND 74, ¶ 9, 592 N.W.2d 585; *Martin v. Rath*, 1999 ND 31, ¶ 20, 589 N.W.2d 896; *Cermak v. Cermak*, 1997 ND 187, ¶ 9, 569 N.W.2d 280; *Olson v. Souris River Telecomms. Coop., Inc.*, 1997 ND 10, ¶ 13, 558 N.W.2d 333; *Burr v. Trinity Med. Ctr.*, 492 N.W.2d 904, 907–10 (N.D.1992); *Nuelle v. Wells*, 154 N.W.2d 364, 365–66 (N.D.1967); *Fitzmaurice v. Fitzmaurice*, 62 N.D. 191, 196–200, 242 N.W. 526, 527–29 (1932); *Reeves & Co. v. Russell*, 28 N.D. 265, 275–83, 148 N.W. 654, 657–61 (1914) (on petition for rehearing).

"In *Hill*, 1999 ND 74, ¶ 9, 592 N.W.2d 585, we said '[w]here the provisions of the statute differ from previous case law, the statute prevails.' In *Rath*, 1999 ND 31, ¶ 20, 589 N.W.2d 896, we said '[s]tatutory principles govern over general common law if there is a conflict.' In *Burr*, 492 N.W.2d at 907–10, we recognized a hierarchy which favored statutory law over common law, and we declined to apply a common law doctrine of equitable tolling to toll a malpractice statute of limitations. In *Nuelle*, 154 N.W.2d at 365–66, we concluded statutory provisions in N.D.C.C. § 9–10–06

for negligence actions prevailed over the common law doctrine that unemancipated minors could not maintain tort actions against their parents. In *Fitzmaurice*, 62 N.D. at 196–200, 242 N.W. at 527–29, we held the common law rule that a wife may not sue her husband in tort was abrogated by statute. In *Herbert*, 116 U.S. at 654 [6 S.Ct. 590], the United States Supreme Court discussed the predecessor of N.D.C.C. § 1–01–06, and said the code governs where it declares the law, but the common law prevails where the code is silent, and if language in the code is not defined by the code, that language can be explained by case law. The common thread in the cases applying the language of N.D.C.C. § 1–01–06 is '[t]here cannot be two rules of law on the same subject contradicting each other.' *Herbert*, at 654 [6 S.Ct. 590]. *See also Rath*, at ¶ 20 ('[s]tatutory principles govern over general common law if there is a conflict.')."

*Bornsen*, at ¶¶ 14–15; *see also Oakland v. Bowman*, 2013 ND 217, ¶¶ 10–11, 840 N.W.2d 88 (refusing to apply equitable tolling).

[¶ 13] Section 9–03–05, N.D.C.C., clearly requires physical action to constitute duress. The elements to establish economic duress fall outside the specific terms of the statute. Policy reasons may exist favoring adoption of the economic duress doctrine, but that is a decision for the legislature. The legislature has not chosen to recognize the economic duress doctrine, and that "is a legislative determination which we are bound to follow." *Bornsen*, 2011 ND 183, ¶ 18, 804 N.W.2d 55.

[¶ 14] Because North Dakota law does not recognize the economic duress doc-

trine, we conclude the district court erred as a matter of law in relying on the doctrine to rescind the agreement and release.

### III

[¶ 15]   The Finstads argue other legal grounds support the district court's decision that the agreement and release is void.

### A

■ [¶ 16]   The Finstads argue the agreement and release "lacked lawful consideration" because the "sole object" of the agreement and release and "the sham rental agreement was to secure PFC payments on the land for 2001."

[¶ 17]   Section 9–05–03, N.D.C.C., provides that "[t]he consideration of a contract must be lawful within the meaning of section 9–08–01." Section 9–08–01, N.D.C.C., provides:

"Any provision of a contract is unlawful if it is:

1.   Contrary to an express provision of law;
2.   Contrary to the policy of express law, though not expressly prohibited; or
3.   Otherwise contrary to good morals."

"If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." N.D.C.C. § 9–05–04.

[¶ 18]   In *Huber v. Farmers Union Serv. Ass'n*, 2010 ND 151, 787 N.W.2d 268, this Court rejected the argument that the parties' local agent's agreements were void as a matter of law under N.D.C.C. § 9–08–01 because the agreements violated federal and state laws, reasoning:

"[T]his Court's decisions clearly demonstrate that a provision of a contract

must in and of itself be inherently illegal to be unlawful for purposes of N.D.C.C. § 9–08–01. For example, in *North Central Jobbers v. Snortland*, 329 N.W.2d 614, 618–19 (N.D.1983), this Court held there was nothing inherently illegal in a contract to transfer title to trucks and trailers even if the contract was entered into merely as a subterfuge to evade provisions of the Interstate Commerce Act. In *State Bank of Towner, Inc. v. Rauh*, 288 N.W.2d 299, 307 (N.D.1980), this Court held there was nothing inherently illegal in a contract to purchase cattle, feed, and to sell cattle even if the contract was a facade to evade taxes. So too, in *Beck v. Lind*, 235 N.W.2d 239, 245 (N.D.1975), this Court ruled a contract of employment for performing personal services was not per se illegal and invalid even if it involved an arrangement to avoid paying contributions to Social Security. In this case, there is nothing inherently unlawful in the provisions of the parties' local agent's agreements."

*Huber*, at ¶ 12.

[¶ 19]   Even if the parties intended to obtain arguably illegally PFC payments on the land through use of the farm rental contract and the agreement and release, there is nothing inherently illegal in either of those contracts. We conclude these contracts were not unlawful under N.D.C.C. § 9–08–01.

### B

■ [¶ 20]   The Finstads argue no consideration supported the agreement and release.

■ [¶ 21]   Whether consideration for a contract exists is a question of law. *See Anderson v. Zimbelman*, 2014 ND 34, ¶ 18, 842 N.W.2d 852. We reject the Finstads' argument for two reasons. First,

the agreement and release specifically states the Finstads received consideration in the form of "the right to collect all government payments available for 2001." Second, foregoing a lawsuit can be sufficient consideration, *see Anderson,* at ¶ 19, and John Finstad testified he and his wife entered into the contracts "rather than trying to fight the district" and "to preserve our rights to rent the land back at some point in time." We conclude consideration existed for the agreement and release.

### C

[¶ 22] The Finstads argue the District is essentially requesting specific performance, an equitable remedy, and the district court had ample grounds to refuse to enforce the agreement and release under its broad equitable powers.

[¶ 23] The Finstads' suggestion that the district court could have reached the same result under amorphous principles of equity is misplaced. "We have often said '[e]quity follows the letter and the spirit of the law and courts of equity are bound by and must follow and apply the principles of substantive law.'" *Red River State Bank v. Reierson,* 533 N.W.2d 683, 691 (N.D.1995) (quoting *Langenes v. Bullinger,* 328 N.W.2d 241, 246 (N.D. 1982)). An "equitable remedy cannot avoid the meaning of an unambiguous statute." *Estate of Voeller,* 534 N.W.2d 24, 26 (N.D.1995). The court under its equitable powers could not grant relief precluded by unambiguous statutes.

### IV

[¶ 24] We do not address other arguments raised because they either are unnecessary to the decision or are without merit. North Dakota law does not recognize the economic duress doctrine. The agreement and release is valid and enforceable and bars the Finstads' action. The judgment is reversed.

[¶ 25] LISA FAIR McEVERS and DALE V. SANDSTROM, JJ., concur.

VANDE WALLE, Chief Justice, concurring and dissenting.

[¶ 26] I agree with the majority opinion that the judgment of the district court should be reversed but I do so for different reasons than does the majority and I disagree with the rationale used by the majority to reach its result.

[¶ 27] I believe the judgment should be reversed because, if we were to apply an economic duress doctrine, I cannot conclude, under the facts of this case, that the essential elements of the doctrine, as outlined in ¶ 9 of the majority opinion, have been met. In particular I question whether the facts sustain the first element, i.e., that one side involuntarily accepted the terms of another, as well as the second element, i.e., that the circumstances permitted no other alternative. If one looks at the "no other alternative" to mean there was no other alternative to the Finstads receiving the $2,500 PFC payment I might agree the element was met. However, I believe we must look beyond the $2,500 and I am unconvinced that there was no other alternative. As noted by the majority in ¶ 5, John Finstad testified he was "under a lot of stress and ... I have no strength for this." There was, of course, an alternative and that was to contest the District's decision to terminate the leaseback rights in 2001. *Cf. Mellon v. Norwest Bank,* 493 N.W.2d 700, 702–04 (N.D. 1992) (holding doctrine does not apply because specific performance to enforce oral contract was an alternative to signing other contract). Furthermore, John Finstad testified "we thought we'd just cooperate and try to preserve our rights to rent the

land back at some point in time." Majority at ¶ 5. I am unconvinced that rises to an "involuntary" acceptance of the terms of the other party.

[¶ 28] Because I do not believe the elements of economic duress were established as a matter of law in this instance, I would follow this Court's precedent, outlined in ¶ 9 of the majority opinion, and conclude it is unnecessary to decide whether or not to adopt the doctrine.

[¶ 29] More significantly, however, the majority concludes that the economic distress doctrine cannot apply in North Dakota, as a matter of law, because the Legislature has preempted the issue by the enactment of N.D.C.C. § 9–03–05. This was an issue neither raised nor briefed by the parties. In its cross-appeal the District argued that the trial court erred, as a matter of law, in holding the facts constituted economic duress. It did not argue economic duress could not, regardless of the facts, apply in North Dakota as a matter of law.

[¶ 30] Although the lack of citation to a controlling statute does not entitle this Court to ignore that statute, I am not prepared, without briefing and argument, to so quickly conclude the Legislature has preempted the field in this instance. Whether or not the definition of duress, which on its face is limited to physical confinement of persons or unlawful detention of property, is the only form of duress that the Legislature has or allows to be recognized is an open question which I would not answer under the facts of this case.

[¶ 31] CAROL RONNING KAPSNER, J., concur.