NED NASTROM MOTORS, INC., former-
ly Nastrom-Peterson Motors, Inc.,
Plaintiff and Appellee,

v.

NASTROM–PETERSON–NEUBAUER
COMPANY; N.P.N., Inc.; and
David Neubauer, Defendants,

Donald Peterson, Defendant
and Appellant.

Civ. No. 10336.

Supreme Court of North Dakota.

Aug. 4, 1983.

Lundberg, Conmy, Nodland, Lucas & Schulz, Bismarck, for plaintiff and appellee; argued by Patrick A. Conmy, Bismarck.

Fleck, Mather, Strutz & Mayer, Bismarck, for defendant and appellant; argued by Steven A. Storslee, Bismarck.

ERICKSTAD, Chief Justice.

Ned Nastrom Motors, Inc., formerly Nastrom-Peterson Motors, Inc., brought an action against Nastrom-Peterson-Neubauer Company, N.P.N., Inc., Donald Peterson, and David Neubauer alleging that the defendants were liable to the plaintiff under the terms of seven lease agreements. The trial court adjudged in a bench trial that defendant, Nastrom-Peterson-Neubauer Company (hereinafter "Equipment"), was liable to Ned Nastrom Motors, Inc. (hereinafter "Motors"), pursuant to the specific contractual agreements in question and that defendant, Donald Peterson, had personally guaranteed Equipment's indebtedness under such agreements. A judgment[1], dated October 26, 1982, in the amount of $129,793.21, was entered in accordance therewith from which Peterson now appeals. For the reasons hereinafter stated, we affirm.

The issues to be adjudicated on appeal are two-fold:

(1) Whether or not Nastrom-Peterson-Neubauer Company was obligated to Ned Nastrom Motors, Inc., under the specific financial transactions in question; and, if so, whether or not Equipment was obligated in the amount of $129,793.21; and,

(2) Whether or not Peterson personally guaranteed Nastrom-Peterson-Neubauer Company's indebtedness to Ned Nastrom Motors, Inc.

For purposes of clarity, we will divide this opinion into two distinct sections.

## I.

### Nastrom-Peterson-Neubauer Company's Obligation to Ned Nastrom Motors, Inc.

The facts relevant to this aspect of the case are not in dispute and thus can be

---

1.  "The Honorable Dennis A. Schneider, Judge of the District Court, having filed herein findings of fact, conclusions of law, and order for judgment, now, therefore, pursuant to such order for judgment, it is hereby ORDERED, ADJUDGED AND DECREED that the plaintiff, Ned Nastrom Motors, Inc., have judgment as follows:
    "1.
    "*Against defendant Donald Peterson:* The sum of $129,793.21, plus interest thereon from May 19, 1979, at the rate of Six Percent (6%) per annum, in the amount of $27,-300.00, plus costs and disbursements in the amount of $438.70, or as retaxed and allowed by the Clerk, for a total of $157,531.91.
    "2.
    "*Against. Nastrom-Peterson-Neubauer Company:* The sum of $129,793.21, plus interest thereon from May 19, 1979, at the rate of Six Percent (6%) per annum, in the amount of $27,300.00, plus costs and disbursements in the amount of $438.70, or as retaxed and allowed by the Clerk, for a total of $157,-531.91."

briefly summarized. Nastrom-Peterson Motors, Inc., was owned jointly by Ned Nastrom and Donald Peterson when it was formed in 1972. Nastrom-Peterson-Neubauer Company was owned equally by Ned Nastrom, Donald Peterson, and David Neubauer when it was organized in 1976. On April 24, 1978, pursuant to a stock exchange agreement, Nastrom transferred his stock in Equipment to Peterson in exchange for Peterson's stock in Motors. As a result, Nastrom became the sole owner of Nastrom-Peterson Motors, Inc., which became known as Ned Nastrom Motors, Inc., and Peterson became the controlling shareholder in Equipment.

Throughout 1976, 1977, and 1978, Motors and Equipment entered into approximately 70 lease agreements. These contractual agreements in which Motors was the lessor and Equipment was the lessee covered cars, trucks, construction equipment, telephone equipment, radio equipment, tools and furniture. This lawsuit is premised upon seven such leases which were received into evidence as Exhibits 1–7:

| | |
|---|---|
| Exhibit 1: | Tools and Furniture |
| Exhibit 2: | Furniture |
| Exhibit 3: | Six radios |
| Exhibit 4: | Twelve radios |
| Exhibit 5: | (Tony Boehm) |
| Exhibit 6: | (A & B Construction) |
| Exhibit 7: | (Kyro Construction) |

The lease agreements covering the tools and furniture were executed by Motors and Equipment on October 21, 1977. The items covered by these two leases were originally purchased by Equipment. However, Equipment gave the invoices evidencing these purchases to Motors who prepared, based upon these invoices, lease agreements covering the items. Motors assigned such leases to the First National Bank and Trust Company for value. With the proceeds it received from First National, Motors paid Equipment for the tools and furniture. The end result of these financial arrangements was that Motors was obligated to pay the bank certain monthly payments and Equipment was obligated to pay Motors the same monthly payments. The circumstances surrounding the leases covering the radios were similar in nature to those concerning the tools and furniture.

On July 27, 1976, Equipment leased certain pieces of machinery to Tony Boehm, A & B Construction, and Kyro Construction. Motors did not prepare any leases evidencing that it was in fact leasing the machinery covered by such leases to Equipment; nevertheless, invoices, dated July 27, 1976, reveal that such machinery was sold by Equipment to Motors as of that date. To finance these purchases, Motors assigned its interest under the Boehm, A & B, and Kyro leases to the First National Bank and Trust Company and the State Bank of Burleigh County for value. Motors paid Equipment for such machinery with the funds it received from First National and State. Summarily described, these financial arrangements created a situation where the original lessee, either Tony Boehm, A & B Construction, or Kyro Construction would pay Equipment; Equipment would then remit this same sum to Motors who would pay the financial institution involved.

Upon analyzing these seven transactions, it is evident that Motors was in essence a "funnel" through which Equipment obtained financing. This complicated method of financing was embarked upon because Equipment did not have "legitimate credit available at the bank."

Preliminary to our adjudication of the merits of this appeal, we must ascertain whether or not Exhibits 1–7 were properly admitted into evidence through the testimony of David Graham. Peterson contends that Graham was not employed at Equipment when the Boehm, A & B Construction, and Kyro Construction leases were consummated, and therefore the plaintiff failed to lay a proper foundation for such exhibits.

Nevertheless, whether or not an exhibit should have been excluded on the basis that it lacked adequate foundation is primarily within the sound discretion of the trial court, the exercise of which will not be disturbed on appeal in the absence of a showing that it affected the substantial rights of the parties. *Fox v. Bellon,* 136

N.W.2d 134, 142 (N.D.1965). In the case at bar, the financial arrangements in question were ongoing during the time Graham was employed at Equipment. Hence, Graham became familiar with both the documentation and the circumstances surrounding these transactions through servicing such accounts. Accordingly, we conclude that Exhibits 5, 6, and 7 were properly admitted into evidence. Peterson has neglected to enlighten this court as to why Exhibits 1, 2, 3, and 4 lacked adequate foundation. Hence, we conclude that such exhibits were also properly received into evidence.[2]

■ The remainder of Peterson's assertions involve the trial court's findings of fact. It is elementary that a trial court's findings of fact "shall not be set aside unless clearly erroneous." Rule 52(a), N.D.R. Civ.P. A finding is clearly erroneous only when, although there is some evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *United States v. United States Gypsum Co.* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Wilhelm v. Berger,* 297 N.W.2d 776, 779 (N.D.1980); *Alumni Association of University v. Hart Agency, Inc.,* 283 N.W.2d 119, 121 (N.D. 1979); *In Re Estate of Elmer,* 210 N.W.2d 815, 820 (N.D.1973). That we may have viewed the facts differently if we had been the initial trier of the case does not entitle us to reverse the lower court. *United States v. National Association of Real Estate Boards,* 339 U.S. 485, 495–96, 70 S.Ct. 711, 717, 94 L.Ed. 1007 (1950); *Nee v. Linwood Securities Co.,* 174 F.2d 434, 437 (8th Cir.1949); *In Re Estate of Elmer, supra,* 210 N.W.2d at 820. Our function is not to decide factual issues de novo. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969); *In Re Estate of Elmer, supra,* 210 N.W.2d at 820.

The first factual issue to be resolved on appeal is:

Whether or not the trial court was clearly erroneous in concluding that Motors was

a secured creditor, not a capital investor, of Equipment.

Peterson's specific contention is that the monies Motors advanced to Equipment pursuant to the aforementioned agreements constituted capital contributions.

■ The intent of the participating parties is the salient factor in determining the true relationship between parties to a monetary transaction. *Wood Preserving Corp. of Baltimore v. United States,* 347 F.2d 117, 119 (4th Cir.1965); *Mosebach v. Blythe,* 282 N.W.2d 755, 761 (Iowa 1979). A party's intent is ascertained not only from his testimony but also from the circumstances surrounding the transaction. *Wood Preserving Corp. v. Baltimore, supra,* 347 F.2d at 119; *Mosebach, supra,* 282 N.W.2d at 761.

■ Upon scrutinizing the evidence, it is clear that the trial court correctly concluded that these financial transactions did not constitute capital contributions. The reasons underlying our conclusion are threefold. First, Equipment dutifully remitted payments to Motors on the basis of these seven transactions until April 19, 1979. Second, such transactions were reflected in Equipment's general ledger as liabilities. It is highly unlikely that the parties involved intended the monies in question to be injections of capital if such transactions were entered on Equipment's books as obligations. And, thirdly, the parties executed written lease agreements with regard to the "tools", "furniture", and "radios." Although the parties did not execute any written leases with regard to the Tony Boehm, A & B Construction, and Kyro Construction transactions, such transactions were structured in the same manner as those concerning the "tools", "furniture", and "radios" and, accordingly, we believe the parties intended these transactions to be construed in a similar manner (*i.e.* as leases).

Peterson next attacks the trial court's determination of the amount of damages suffered by Motors:

---

**2.** We note that Peterson did object to these exhibits at trial; nevertheless, his objections and the reasons therefore were not specifically reiterated on appeal.

"Motors sustained damages as follows:

| | |
|---|---|
| Lease payments due | $163,793.21 |
| Less N.P.N., Inc., settlement | 19,000.00 |
| Subtotal | $144,793.21 |
| Less value of returned equipment | 15,000.00 |
| Net loss | $129,793.21 |
| Plus interest from 5//1979 to date | 27,300.00 |
| Total | $157,093.21" |

Specifically, Peterson contends that based upon the unrebutted accounting testimony of Marvin Heinert, a C.P.A., the lease payments due were $24,622.23 not $163.793.21.

Nevertheless, on cross-examination, Heinert conceded that this figure merely represented Equipment's indebtedness under the "tools", "furniture", and "radio" leases. Heinert further testified that Equipment's general ledger reflects that $45,000 of Equipment's indebtedness to Motors under the Tony Boehm and Kyro Construction leases was shown as "cancelled by the delivery of a loader" to Ned Nastrom. However, the record clearly reveals that this loader was delivered to Nastrom as payment for real estate, not as payment for Equipment's lease obligations.

Heinert's testimony also reveals that Equipment's obligation pursuant to the A & B Construction lease was transferred into another liability account, namely "First National Bank, notes (accounts) payable." This transfer, which in effect eliminated Equipment's obligation to Motors under the A & B lease from Equipment's books, was a mere accounting entry inasmuch as there is no evidence to indicate that Equipment actually paid such debt.

■ It is our view from examining the record that the trial court's finding that lease payments were due in the amount of $163,793.21 is not clearly erroneous. This figure which was introduced into evidence through David Graham's testimony was calculated by Graham thusly: the monthly lease payment due under the lease in question was multiplied by the number of monthly payments due under such lease; from this figure Graham subtracted, based upon Motors accounts receivable journal,

the lease payments which Motors had received.[3]

Peterson also asserts that the trial court erred in concluding that the value of the returned equipment was $15,000.00. The equipment which was recovered by Motors included a dynahoe and a Kubota garden tractor.

Upon scrutinizing the record, we are not left with a definite and firm conviction that the trial court committed a mistake in concluding that the value of the dynahoe and tractor was $15,000.00. The reasons underlying our conclusion are twofold. First, the tractor was resold by Motors "for a couple thousand dollars." Secondly, the trial court's finding that the dynahoe had a value of approximately $13,000.00 appears reasonable in light of the fact that it was originally purchased on July 27, 1976, for $35,500.00.

### II.

Donald Peterson's Personal Guarantee of Nastrom-Peterson-Neubauer Company's Obligation to Ned Nastrom-Motors, Inc.

The following facts are relevant to this aspect of the case. All of the equipment sold or leased by Equipment was floor planned to either a financial institution or a manufacturer such as Clark Equipment Company. When Equipment sold or leased a piece of this equipment, the bank or manufacturer which floor planned that particular piece of equipment was entitled to all or a portion of the proceeds Equipment received. If Equipment failed to remit such monies, the sale or lease in question was deemed to be "out of trust."

In 1978, Clark Equipment Company discovered that a large "out of trust" situation existed at Equipment. Hence, Clark who had a blanket security interest on virtually all of Equipment's machinery and other property placed Equipment under "lock and key" pending foreclosure. At this time, it should be noted that Peterson had personal-

---

**3.** Such calculations also took into consideration the buy-out provisions set forth in each lease.

ly guaranteed a large number of Equipment's debts.

Confronted with this financial crisis, Peterson negotiated to sell Equipment's assets to N.P.N., Inc. The sole purpose of this sale, which was consummated on April 14, 1979, was to generate enough capital for Equipment to pay off all its valid creditors. As a consequence thereof, Peterson would be absolved of his personal liability to such creditors. Subsequent to such sale, Equipment did in fact satisfy all of its outstanding liabilities with the exception of its indebtedness to Motors.[4]

While Peterson was negotiating to sell Equipment's assets, Nastrom heard that Peterson was contemplating such sale and as a result he became apprehensive about the validity of Equipment's lease obligations to Motors. Nastrom therefore arranged to meet with Peterson so that they could discuss these leases. Nastrom's testimony[5] concerning his conversation with Peterson reads as follows:

"Q. Can you relate to the Court as best you can recall what was said by the participants in that discussion?

"A. Well, we visited primarily, and I asked Mr. Peterson how his transaction was coming with the possible sale, and he said it looked fine or at least they were in negotiations. And at that point in time I asked him concerning our lease portfolio, and he assured me at that time that I would be taken care of or the car company would be taken care of.

"Q. Can you remember the exact words that were spoken? I don't know if you can. I'm asking you: Can you?

"A. I said, 'Don, are you going to take—you know, get a deal put together? What about all the stuff we've got leased out there?' And he said, 'Well, we'll put a deal together, and I'll make sure that you're taken care of.'

\*   \*   \*   \*   \*   \*

"Q. And do I interpret the wording of your recollection of that conversation to indicate to you that Mr. Peterson was personally going to pay those leases out of his own pocket?

"A. He would—He assured me that he personally would take care of it, yes.

"Q. He personally, out of his own funds?

"A. Out of the funds of the company or whatever, he was going to see that I would be—or the garage or the motor company would be reimbursed for their leases."

Determining whether or not Peterson's statements constituted a personal guarantee was the exclusive function of the trier of fact, the trial court. *Nelson v. TMH, Inc.*, 292 N.W.2d 580, 583 (N.D.1980); *State Bank of Towner, Inc. v. Rauh*, 288

---

4. A substantial portion of Equipment's liabilities were paid with Peterson's personal funds.

5. Joe Sweere, who was also present during this conversation, testified as follows:

"Q. ... At any time during that conversation, Mr. Sweere, did Mr. Peterson indicate that he was going to be personally guaranteeing any indebtedness that the car company had with the equipment company?

"Q. [*sic*] I think the whole world would be—would run a lot smoother if we all talked in legalese like you fellows do or if you all talked in business terms like we do. Neither of those is very evident to me.

"I suppose the natural question for Mr. Nastrom to ask would be: 'Mr. Peterson, is Nastrom-Peterson-Neubauer Equipment Company going to pay off the leases that are owed to Nastrom Motors, Inc.—Ned Nastrom Motors, Inc.?' And the logical response from Mr. Peterson would be: 'I'm sure that every attempt will be made by my—by the corporation Nastrom-Peterson-Neubauer Equipment Company to pay Ned Nastrom Motors.' Neither of those things occurred.

"In business jargon, you know, Ned, I'm sure referred to 'I'm being hung out,' meaning Ned Nastrom Motors. Mr. Peterson says, 'We will make every attempt to get it taken care of, don't worry about it.' "

Sweere further testified that "to interpret [these statements] as a personal guarantee on behalf of Mr. Peterson is ludicrous." It is interesting to note that Sweere and Nastrom do not differ as to what was said during this conversation; the conflict arises as to how each party would interpret Peterson's remarks. It is the function of the trial court to determine, based on the witnesses' recollection of the conversation in question, whether or not Peterson's statements constituted a guarantee.

N.W.2d 299, 305 (N.D.1980). In this instance, Nastrom and Peterson had been involved in numerous business ventures throughout the past ten years, many of which were loosely structured. Based on his prior dealings with Peterson, Nastrom believed that "Mr. Peterson's word was better than most men's checks." Hence, given the relationship between the parties, it is abundantly clear that Peterson must have known that Nastrom would interpret his statements as a personal guarantee. Furthermore, it would have been unreasonable for Nastrom to believe that Peterson was making such statements in his capacity as an officer of the corporation inasmuch as "no purpose would be served by a corporation guaranteeing its own debts." *Johnson Brothers Wholesale Liquor Company v. Otto's Liquor, Inc.*, 292 Minn. 481, 194 N.W.2d 592 (Minn.1972). Viewing the circumstances surrounding Peterson's statements in their entirety, we conclude that the findings of the trial court to the effect that Peterson personally guaranteed Equipment's obligations to Motors were not clearly erroneous.

Peterson's next contention is that even if a personal guarantee was created,

such guarantee is not enforceable under Section 22–01–04, N.D.C.C.,[6] as it was not in writing:

> "22–01–04. *Guaranty to be in writing—Exception—Consideration need not be expressed.*—Except when a guaranty is deemed an original obligation as provided in section 22–01–05, a guaranty must be in writing and signed by the guarantor, but the writing need not express a consideration."

Nevertheless, this court has previously stated: "[a] rule of law in any event should not be applied so as to benefit the principal perpetrator of the violation." *Beck v. Lind* 235 N.W.2d 239, 246 (N.D.1975). In addition, the statute of.frauds should never be utilized to perpetrate a fraud or promote an injustice. *Nelson, supra,* 292 N.W.2d at 584.

In accordance with the foregoing philosophies, the following general rule has been developed to determine whether or not an oral guarantee is excepted from the statute of frauds:

> "'... when the leading object of the promise or agreement is to become guarantor or surety to the promisee, for a

---

**6.** Other relevant statutes include Section 9–06–04, N.D.C.C., and Section 22–01–05, N.D.C.C., which state in relevant part:

"9–06–04. *Contracts invalid unless in writing—Statute of frauds.*—The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by his agent:

\* \* \* \* \* \*

"2. A special promise to answer for the debt, default, or miscarriage of another, except in the cases provided for in section 22–01–05; ..."

"22–01–05. *When a guaranty need not be in writing.*—A promise to answer for the obligation of another in any of the following cases is deemed an original obligation of the promisor and need not be in writing:
1. When the promise is made by one who has received property of another upon an undertaking to apply it pursuant to such promise, or by one who has received a discharge from an obligation in whole or in part in consideration of such promise.
2. When the creditor parts with value or enters into an obligation in consideration of the obligation in respect to which the prom-

ise is made, in terms or under circumstances which render the party making the promise the principal debtor and the person in whose behalf it is made his surety.
3. When the promise, being for an antecedent obligation of another, is made upon the consideration that the party receiving it shall cancel the antecedent obligation and accept the new promise as a substitute therefor, or upon the consideration that the party receiving it shall release the property of another .from a levy under an execution on a judgment obtained upon the antecedent obligation, or upon a consideration beneficial to the promisor, whether moving from either party to the antecedent obligation or from another person.
4. When a factor undertakes, for a commission, to sell merchandise and guarantee the sale.
5. When the holder of an instrument for the payment of money upon which a third person is or may become liable to him transfers the instrument in payment of a precedent debt of his, or for a new consideration, and in connection with such transfer, enters into a promise respecting such instrument."

debt for which a third party is and continues to be primarily liable, the agreement, whether made before or after, or at the time with the promise of the principal, is within the statute, and not binding unless evidenced by writing. *On the other hand, when the leading object of the promisor is to subserve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, his promise is not within the statute.'"* State Bank of Towner, Inc., *supra,* 288 N.W.2d at 308, quoting from *Glock v. Hillestad,* 85 N.W.2d 568, 575 (N.D.1957).

Hence, if the primary objective of Peterson's oral guarantee was to subserve some object of his own, notwithstanding that the effect of such promise would be to pay Equipment's debt, Peterson's promise was an original obligation and not within the statute of frauds. *State Bank of Towner, Inc., supra,* 288 N.W.2d at 308; *Nelson, supra,* 292 N.W.2d at 584; *Austford v.*

*Smith,* 196 N.W.2d 413, 417 (N.D.1972); *Glock, supra,* 85 N.W.2d at 575.

In this instance, the trial court apparently concluded, and reasonably so, that the principal objective of Peterson's oral guarantee was to further the sale of Equipment's assets without any interference from Motors. Nastrom apparently relied upon Peterson's assurances and, in accordance therewith, refrained from pursuing either a lawsuit or bankruptcy proceedings to protect his interests. Because Peterson had personally guaranteed a number of Equipment's debts, he had a direct financial interest in completing such sale. Hence, by completing the sale, Peterson received a direct personal benefit. Peterson's oral guarantee was therefore an original obligation and not within the statute of frauds.[7] In accordance with the reasons stated herein, we affirm.[8]

VANDE WALLE, SAND, PEDERSON and PAULSON, JJ., concur.

---

**7.** In his brief, counsel for Peterson states that: "Although the court does not specifically explain why the statute of frauds would not apply in this case, the findings seem to indicate that the court found actual fraud on the part of Mr. Peterson which would eliminate the requirement of a writing." Nevertheless, because we have determined that Peterson's oral guarantee is an original obligation which is excepted from the statute of frauds and such determination is supported by the trial court's findings of fact, we do not deem it necessary to address the question of whether or not the trial court erred in finding fraud.

**8.** Peterson also requests that the trial court's judgment be reversed and that the case be remanded for a new trial on the basis of the trial court's letter to the parties:

"October 12, 1982
"Patrick A. Conmy
"Attorney at Law
"P.O. Box 1398
"Bismarck, ND 58502
"Steven A. Storslee
"Attorney at Law
"P.O. Box 2798
"Bismarck, ND 58502
"Re: Nastrom Motors v. Nastrom-Peterson et al
"Gentlemen:
"I give up. After seven tries at forming a memorandum opinion in this case, I give up.

"Mr. Conmy's proposed findings of fact very closely approximate the court's view of the facts, and most of all his conclusion is the same as the court's.
"Therefore, Mr. Conmy will prepare the final findings of fact, conclusions of law and order for judgment as found in his proposal, for the court's signature, and submit the judgment in this case.
"You won, Pat, and you lost, Steve, but frankly, I'm still not entirely certain why.
"Sincerely yours,
"Dennis A. Schneider
"District Judge"

Even if viewed in a manner most favorable to Peterson, we believe that such letter can, at its strongest, only be considered as a memorandum opinion. Although this letter (memorandum opinion) indicates that the trial court has absolutely no understanding of why Motors prevailed in this lawsuit, the court's findings of fact are significantly clairvoyant.

It is well established that where there is a discrepancy between a memorandum opinion and the findings of fact the later prevails. *Schmidt v. Plains Elec., Inc.,* 281 N.W.2d 794, 801 (N.D.1979); *Harwood v. Harwood,* 283 N.W.2d 144, 146 (N.D.1979); *Kack v. Kack,* 142 N.W.2d 754, 763 (N.D.1966). Hence, although the trial court's letter is unfortunate, it does not warrant a new trial inasmuch as our review of this case is premised upon the trial court's findings of fact which are adequate.