Geri G. DAVIS, Plaintiff and Appellant,

v.

Jay D. DAVIS, Defendant and Appellee.

Civ. No. 890342.

Supreme Court of North Dakota.

July 3, 1990.

Lundberg, Nodland, Schulz, Lervick, Tharaldson & Dickson, P.C., Bismarck, for plaintiff and appellant; argued by Ardell Tharaldson.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for defendant and appellee; argued by Pamela J. Hermes.

ERICKSTAD, Chief Justice.

Geri Davis appeals from a divorce judgment of the District Court for Cass County, granting her a divorce from Jay Davis and making a division of property of the marital estate. We deny the motion to dismiss and affirm.

Jay and Geri were married on December 29, 1969. They were both 40 years old at the time of trial. Their 19 year marriage began as they were both in the final year of obtaining undergraduate degrees from the University of North Dakota. Geri earned her degree in Elementary Education, while Jay earned his degree in Business. In 1970, they moved to Bismarck, North Dakota. Geri got a job teaching the second grade, while Jay began working in the family auto dealership, which he contends he received an interest in prior to the marriage through gifts from his grandfather.

Geri stopped working in 1974 in anticipation of beginning a family. They have two children, twins who were born in 1976. Jay continued to work in the auto dealership. During the marriage, Jay was able to purchase additional stock in the dealership as a result of an option obtained for him at no cost to his family. In 1978, Jay sold his interest in the Bismarck dealership for a cash payment of $480,000. The parties then moved to Moorhead, Minnesota. There, Jay purchased a Chevrolet dealership for a total price of $560,000. Of that amount, $350,000 was initially put into the dealership, with the remainder being financed.

Geri stayed at home with the twins until they began Kindergarten. She then began working part-time as a tutor. After the children began the first grade, Geri began teaching full-time.

In 1980, Jay received a Small Business Administration loan of $250,000 and a loan of $100,000 from his father's family trust. This money was interjected into his auto dealership. In 1981, Jay merged his Moorhead dealership with a Fargo Chevrolet dealership. Jay operated his Fargo–Moorhead dealership and Geri continued as a full-time teacher until August of 1985. At that time, Jay sold his interest in the Fargo–Moorhead dealership for a cash payment of $200,000 and $5,000 a month for 24 months. After the sale of the dealership, Jay and Geri moved to Dallas, Texas, but returned to Fargo, North Dakota, to live in September of 1986.

Upon their return to Fargo, Geri secured employment with the Fargo Public School System as a teacher in the "Gifted and Talented Program." She continues as a full-time elementary teacher in that program. In January of 1987, Jay purchased the Aamco Transmissions business in Fargo, for a total of $115,000. Jay paid $50,000 of the purchase price with cash he had received from the sale of his Fargo–Moorhead dealership. The balance was financed

with a local bank. Jay continues to be the sole owner and proprietor of Aamco Transmissions.

Geri filed for a divorce on October 25, 1988. At the outset of the trial, the parties stipulated as to all matters regarding their children and to a division of their household property. No spousal support and no child support was requested or awarded. Jay has custody of the children. The trial court made a distribution of the property of the marital estate.

On appeal, Geri argues that three decisions made by the trial court were clearly erroneous and constitute reversible error. First, she contends that the findings of fact drafted by counsel for Jay went beyond the oral findings and conclusions of the trial court articulated pursuant to Rule 52 of the North Dakota Rules of Civil Procedure. Secondly, Geri contends that using the values assigned by the court, she received only $38,938 of the marital estate, while Jay received $194,104. Finally, Geri contends that the trial court's acceptance of Jay's financial statement pursuant to the divorce proceeding, which varied greatly from a previous financial statement issued by Jay in a business matter, violated public policy.

Jay filed a motion to dismiss the appeal pursuant to Rule 27 of the North Dakota Rules of Appellate Procedure upon the ground that Geri accepted substantial benefits pursuant to the divorce judgment and thereby waived her right to appeal. We will first consider Jay's motion to dismiss.

■ The general rule in North Dakota is that a party to a divorce action who accepts substantial benefits pursuant to a divorce judgment thereby waives the right to appeal from the judgment. *White v. White*, 434 N.W.2d 361, 363 (N.D.1989); *Brodersen v. Brodersen*, 374 N.W.2d 76, 77 (N.D. 1985). However, in *White, supra* at 363, we said:

> "We recognized in *Sanford v. Sanford*, [295 N.W.2d 139, 141–42 (N.D. 1980)], that the general rule was subject to several recognized exceptions:
>
>> 'In *Tyler v. Shea*, 4 N.D. 377, 61 N.W. 468 (1894), we said:

>>> ' "Where the reversal of the judgment cannot possibly affect the appellant's right to the benefit he has secured under the judgment, then an appeal may be taken, and will be sustained, despite the fact that the appellant has sought and secured such benefit." 4 N.D. at 381, 61 N.W. at 469.
>>
>> 'This exception was further expounded in *Boyle v. Boyle*, 19 N.D. 522, 524, 126 N.W. 229, 230 (1910), wherein we held:
>>
>>> ' "If a provision of the judgment appears to have been fixed by consent, or is undisputed, or, for any reason, cannot be changed or reversed by the appeal, an acceptance of the benefit given by such provision is not a waiver of the appeal."
>>
>> 'Moreover, in *Grant v. Grant*, [226 N.W.2d 358 (N.D.1975)] *supra* we recognized that the rule which bars a subsequent appeal when substantial benefits of a divorce judgment are accepted is not absolute when we said:
>>
>>> ' "Before the waiver of the right to appeal can be found to exist, there must be an unconditional, voluntary, and conscious acceptance of a substantial benefit under the judgment." 226 N.W.2d at 361.
>>
>> \*    \*    \*    \*    \*    \*
>>
>> 'In addition to the exceptions recognized above, this court has also held that:
>>
>>> ' "It is both practical and just that if one jointly or individually possesses an asset during the pendency of a divorce action and is subsequently awarded that asset by the divorce judgment, he should not have to divest himself of that asset before appealing the judgment. This is most obvious when the asset is a necessity of life." *Piper v. Piper*, 234 N.W.2d [621] at 623 [(N.D.1975)].
>>
>> \*    \*    \*    \*    \*    \*
>>
>> 'Finally, in *Hoge v. Hoge*, 281 N.W.2d 557 (N.D.1979), we recognized a caveat to the general principle that acceptance of benefits under a judgment of divorce precludes a later appeal.... We said in *Hoge* that a party is not estopped from

an appeal of a divorce judgment by the acceptance of alimony and property "to which he or she was entitled as a matter of right." 281 N.W.2d at 563.' "

Jay contends that in accepting the benefits of the following items pursuant to the divorce judgment, Geri has waived her right to appeal: Titles to and possession of the Lincoln and Triumph cars, the Moorhead Country Club stock, $3,851.27 in joint income tax refund checks which were endorsed by Jay, and checks from Jay's personal checking account in satisfaction of the division of cash required by the court after certain debts had been paid. Jay asserts that none of the exceptions apply in this case and that Geri has therefore waived her right to appeal, citing *White v. White*, 434 N.W.2d 361, *supra*, in support of his assertion.

In *White*, Martha White appealed a property division and award of spousal support. Prior to entry of the formal judgment, Martha forwarded to Thomas, her husband, a quitclaim deed for him to sign as to the homestead which was jointly owned real property. Instead, Thomas prepared and signed a warranty deed to Martha for the homestead. Martha also demanded a bill of sale from Thomas for their bar and requested that Thomas sign off of the bar's liquor license, which was done as requested. Titles to the motor vehicles were signed and exchanged, war bonds were divided, and the coin collections were divided. We ruled:

"After taking into account the affirmative actions taken by Martha to transfer title to the homestead to her name, to transfer rights to the bar and liquor license, and to divide the remaining items of property of substantial value, we conclude that Martha accepted substantial benefits under the divorce judgment and therefore Martha waived her right to appeal. Accordingly, Thomas' motion to dismiss Martha's appeal is granted."

*White* at 363-64.

In *Geier v. Geier*, 332 N.W.2d 261 (N.D. 1983), we also dismissed an appeal based upon a substantial acceptance of benefits under the divorce judgment. Edna Geier appealed the property division of the divorce judgment. Subsequent to the entry of judgment, but at Edna's request, Charles Geier executed both deed and title in a jointly owned mobile home to Edna. We said:

"In this case Edna took affirmative steps to have title of jointly held real estate transferred to her name before appealing to this Court. In considering the property awarded to Edna pursuant to the divorce judgment, most of that property, except the mobile home, was her separate property which she would have clearly been entitled to without the divorce decree. In view of the trial court's finding that Charles paid for the mobile home and the understanding between Charles and Edna ... we are not satisfied that Edna would have been entitled to the mobile home but for the divorce decree. Taking into account the affirmative actions taken by Edna to transfer title to the mobile home to her name and the fact that the mobile home was the only item of property awarded to Edna which was not her separate property, we conclude that Edna accepted substantial benefits under the divorce judgment and, therefore, waived her right to appeal." [Footnote omitted.]

*Geier* at 264.

In the instant case, Geri had used the Lincoln car during the marriage and was therefore entitled to continued temporary possession of the automobile. The value of the country club stock is $100 and *de minimis*. As to the Triumph car, the income tax refund checks and the checks in satisfaction of the division of the estate, Geri contends that Jay had sent them on his own initiative. Jay asserts, however, that upon his finding out that Geri was contemplating an appeal, he demanded return of the items previously transferred and informed her that a refusal would be construed as a knowing and voluntary acceptance of the benefits under the judgment decree, thereby forfeiting any right to appeal. In response, Geri asserts that while she did not return the items, she has not negotiated the titles to the vehicles and

they are thus available for any subsequent proceeding. The income tax return checks were negotiated in order to draw interest on them and all the cash has been placed in a separate account. All of the principal and interest are available to the court in a subsequent proceeding.

While the value of the items in question is fairly substantial, approximately $20,000 of a $94,606 estate,[1] we note that the transfer of the items was not in response to the affirmative actions of Geri as was the case in *White, supra* and *Geier, supra*. The party moving to dismiss the appeal must clearly establish the waiver of the right to appeal by the other party. *Brodersen, supra* at 77. The moving party has the burden to demonstrate that benefits accepted by the other party would not be ones to which that party would be entitled without the decree. *Hoge v. Hoge, supra*, 281 N.W.2d at 563. On numerous occasions, we have declined to dismiss an appeal based upon the substantial acceptance of benefits theory. *See Brodersen, supra; Sanford, supra; Hoge, supra; Piper v. Piper, supra*, 234 N.W.2d 621. This Court has also often stated the proposition that we prefer to dispose of litigation on its merits, rather than on procedural grounds. *See Wayne–Juntunen Fertilizer Co. v. Lassonde*, (Civil No. 890324, filed 6/01/90), 456 N.W.2d 519 (N.D.1990); *Lang v. Bank of North Dakota*, 423 N.W.2d 501 (N.D. 1988). Therefore, we conclude that Jay has not carried the burden of showing us that ·Geri has waived the right of appeal or review in this case. We therefore deny the motion to dismiss and accordingly proceed to a consideration of the merits of this appeal.

▮ Geri objects to the written findings of fact which were prepared by counsel for Jay and which were ultimately accepted by the trial court. She contends that the findings are self-serving and go beyond the oral findings which the trial court made pursuant to Rule 52 of the North Dakota Rules of Civil Procedure. Geri asserts that

the written findings were intentionally designed to prevent an appeal of the trial court's decision and should thus be ignored and the case reviewed by this Court upon the Rule 52 oral findings of the trial court.

In *Bergstrom v. Bergstrom*, 296 N.W.2d 490 (N.D.1980), we held that a trial court was not allowed to make findings which, in essence, attempted to "sew up" a party's chances on appeal by making it very difficult for us, as a reviewing court, to find the facts clearly erroneous. In *Bergstrom*, however, the findings related to the credibility of witnesses. The trial court found that the testimony of three experts presented by Alan Bergstrom were entitled to no weight while it found the testimony of Astrid Bergstrom's expert witness credible, and the latter testimony was accepted by the court. These circumstances are distinguishable from the case at hand. Geri contends that the written findings prepared by counsel for Jay go beyond the scope of the trial court's oral findings, not that the trial court's findings were difficult to review as in *Bergstrom*. It is difficult for this Court, on a cold record, to assess the credibility of witnesses. By specifically rejecting all witnesses for one party and accepting the one witness for the opposing party, the trial court, in *Bergstrom*, made it especially difficult for us to review the record in determining whether or not the findings were clearly erroneous. In the case at hand, we can review the record to see if the written findings accepted by the trial court, even though they may expand upon the oral findings, are supported by the evidence.

We have previously held that when there is an inconsistency or discrepancy between a memorandum opinion and the findings of fact, the latter prevail. *Ned Nastrom Motors v. Nastrom–Peterson–Neubauer*, 338 N.W.2d 64, 71, n. 8 (N.D.1983); *Harwood v. Harwood*, 283 N.W.2d 144, 146 (N.D.1979); *Kack v. Kack*, 142 N.W.2d 754, 762 (N.D. 1966). While we do not encourage a trial court to uncritically accept proposed find-

---

1. The $94,606 figure is Jay's valuation of the estate. If Geri's valuation of the estate is accepted, we are dealing with a smaller percentage of the estate, approximately $20,000 of a $233,042 estate.

ings of fact drafted by counsel, we have said:

"[F]indings of fact will not be found clearly erroneous on appeal merely because they were prepared by counsel for the prevailing party and thereafter adopted verbatim by the trial judge. *Warner v. Johnson*, 213 N.W.2d 895 (N.D.1973). When the trial judge affixes his signature to the findings of fact they become the findings of the court irrespective of whether or not they have been prepared by counsel. *Vetter v. Vetter*, 267 N.W.2d 790 (N.D.1978)."

*D.G. Porter, Inc. v. Fridley*, 373 N.W.2d 917, 920 (N.D.1985). Having reviewed the record, we conclude that the written findings made by the trial court are supported by the evidence.

■■■ Geri contends that the trial court's property distribution was clearly erroneous in that she received only 17 percent of the assets while Jay received 83 percent. As we have stated on many occasions, a property division need not be equal to be equitable, but a substantial disparity should be explained. *Heggen v. Heggen*, 452 N.W.2d 96, 98 (N.D.1990). Further, a division of marital property is viewed as a finding of fact subject to the clearly erroneous standard of Rule 52(a), N.D.R.Civ.P. *Bader v. Bader*, 448 N.W.2d 187, 188 (N.D. 1989). Under that standard, we reverse only if there is no evidence to support a finding or if, upon a review of the entire evidence, we are left with a definite and firm conviction that a mistake has been made. *Heggen, supra* at 99.

■■ Geri contends that the net value of the estate is $233,042, and that Jay received $194,104, while she received only $38,938. Jay asserts that the net value of the estate is $94,606, and that he received $37,997, while Geri received $56,609. Jay's figures include the personal and household items, which were distributed evenly. The major discrepancy in the valuations of the parties is based upon what Jay contends to be a liability in the amount of $172,329. This figure, he contends, is a loan which he took out from his father's trust in 1980. Jay contends that the amount is to be used

in the valuation of the net estate, that the liability was given to him in the distribution by the trial court, and that Geri, therefore, received a greater percentage of the estate. Geri contends that the money from the trust was not a loan, was never intended to be repaid and, therefore, should not be viewed as a liability in the valuation of the net estate.

Charles L. Donlin, a co-trustee of the trust, responded to questions about the trust as follows:

"A ... it's basically a typical generation-skipping trust that were commonly written into wills at that time, whereby a substantial portion of the estate is placed in a trust for the corpus of which will eventually go to third generation successors.

"Q And in this case who would the— who would that be?

"A Well, that would be the children of Jay and his sister.

"Q At the present time who receives the income from the trust?

"A Duane Davis's widow, which is Jay's mother.

"Q Upon the—does Jay receive any income from the trust at the present time?

"A No.

\*      \*      \*      \*      \*      \*

"Q (Ms. Hermes continuing) In connection with the trust, has the trust made a loan to Jay Davis?

"A Yes, it has.

"Q Showing you what's been marked as Defendant's Exhibit 4, can you tell me what that is.

"A That's a promissory note executed by Jay Davis for the money loaned to him in 1980.

\*      \*      \*      \*      \*      \*

"Q Was the loan expected to be repaid in the ordinary course of business?

"A Yes. And still is."

Geri asserts that the fact that Jay has made no payments on the note in 9 years is evidence of the fact that there is no intent to repay. In relation to those circumstanc-

es, Donlin responded to questions as follows:

"Q As trustee have you forgiven any portion of the debt owing?

"A No.

\* \* \* \* \* \*

"Q (Ms. Hermes continuing) Why is it that you as trustee have not pursued legal action to enforce the promissory note?

"A The trustee is—or the trust is in fairly good shape financially as far as being able to provide income from the current—for the current beneficiary of income. The loan was made primarily to assist Jay in adverse business conditions with the general understanding that when things are better, he will pay back the loan. I have followed Jay's career since the time of making the loan. He has made a great deal of effort in trying to establish himself in a business where he will be able to not only repay the loan, but bring the interest to current status. And I have just had no reason to press Jay on that. Any pressing would make it more difficult for him to put himself in shape to repay the loan."

Geri contends that the trial court took the alleged loan liability into consideration when setting the value of the trust at $1.00,[2] and that, therefore, the $172,329 (the $100,000 loan from the trust plus interest) should not be separately considered in the valuation of the estate. In its written conclusions of law, however, the trial court specifically said that the loan obligation was one of the debts for which Jay was to be responsible. Also, during the trial court's oral findings, the following discussion took place:

"MS. HERMES: [Counsel for Jay] And I guess I'm assuming the interest in the trust and the trust loan goes to the Defendant [Jay].

"THE COURT: I would think—wasn't that implied?

"MS. HERMES: I thought so, but I—

"THE COURT: I thought it was very implicit, if not explicit. It is now."

Therefore, we conclude that the trial court did intend and did properly include the trust loan as a liability in the valuation of the estate.

Geri next contends that the trial court erred in the valuation of the Aamco Transmissions business. The trial court valued the business at $132,811, based upon the testimony of Gene Gallagher, a certified public accountant.

Gallagher's valuation of $132,811 was based upon the adjusted book value method of accounting. Steven Meihack, a certified public accountant called by Geri, indicated that an earnings component should be included to reach a fair market appraisal of Aamco Transmissions. Based upon his valuation method, Meihack estimated the fair market value of Aamco Transmissions to be $335,000. The trial court is the judge of the credibility of witnesses and of the evidence they introduce. *Roen v. Roen,* 438 N.W.2d 170, 172 (N.D.1989); *Erickson v. Erickson,* 384 N.W.2d 659, 662 (N.D.1986). We will not reexamine questions of fact decided by the trial court upon conflicting evidence and must give due regard to the trial court's ability to assess the credibility of witnesses. *Dakota Bank and Trust v. Federal Land Bank,* 437 N.W.2d 841, 844 (N.D.1989). It was, therefore, within the trial court's discretion to utilize, as it did, Jay's valuation which the court found to be more credible. This seems reasonable in light of the fact that the success of the transmission business seems in large part to be due to Jay's experience and contacts in the automobile business,[3] or so the trial court could have concluded.

Geri also contends that the trial court erred in giving all of the equity of the transmission business and the marital home to Jay. The trial court found that the increased value of Aamco Trans-

---

**2.** The trial court's valuation of Jay's interest in the trust at only one dollar is due to the fact that neither party offered any evidence as to the value of Jay's expectancy and thus the trial court found the value to be speculative.

**3.** The year before Jay bought Aamco Transmissions, the business had sustained a loss. Under Jay's management, it is now profitable.

missions was due to the efforts of Jay. Geri contends, however, that the trial court did not speak to the original value of the business which was at least $115,000, its purchase price. Of the $115,000, $50,000 of the purchase price had come from the sale of Jay's interest in his Fargo–Moorhead car dealership, which had been obtained partially with money from the sale of Jay's interest in the Bismarck car dealership. Jay contends he received part of that interest prior to the marriage.

We have previously recognized a party's work effort during a marriage in assessing a property distribution. *See Volk v. Volk*, 404 N.W.2d 495, 497 (N.D.1987). The source of the property brought into the marriage is also one of the guidelines to take into consideration in a property distribution pursuant to the *Ruff–Fischer* guidelines. *See Routledge v. Routledge*, 377 N.W.2d 542, 548 (N.D.1985). The trial court, therefore, could properly take these factors into consideration in coming to an equitable distribution.

■ Jay contends that Geri received a greater percentage of the net estate but that the evidence would have supported an unequal distribution in his favor, due to the "fault" on the part of Geri. In its oral findings, the trial court indicated that it was Geri's choice to end the marriage and that the greater percentage of fault, while difficult to measure in this case, has to be attributed to Geri. In the written findings of fact accepted by the trial court, the trial court found:

"19. The parties' marriage was a rocky one. Geri's conduct during the marriage, and particularly her current, ongoing extramarital affair, contributed substantially to the eventual dissolution of the marriage. It was Geri's choice to end the marriage....

"20. During most of the parties' marriage, the parties shared in the child care responsibilities and household duties.

"21. Geri continued to reside in the family home after this action was commenced by her, but did not contribute to the household expenses and contributed only minimally to the household responsibilities and care of the children."

While Geri challenges the written findings, we note that on cross-examination, she admitted having had more than one extramarital affair. Fault may be a relevant factor in property division. *Bader, supra*, 448 N.W.2d at 189. A majority of this Court has held no distinction need be drawn between economic fault and non-economic fault. *Bader, supra* at 189; *Persons v. Persons*, 396 N.W.2d 744, 745 (N.D. 1986). In *Erickson, supra*, Elwood Erickson asserted that the trial court, in dividing the property, placed undue emphasis on the fault of the parties. The trial court made a finding that Elwood Erickson had admitted having committed adultery. We held that there was evidence in the record to support the finding and that the trial court had not placed undue emphasis on the fault of the parties in making its distribution of property.

Having reviewed the record in this case, we conclude that the trial court's property division was supported by evidence in the record and is not clearly erroneous.

■ Geri next contends that:

"Judge Leclerc's finding that Mr. Davis's filing of a financial statement under federal penalty for perjury with his bank showing his net worth of $1,356,650 and then after Mr. Davis become aware a divorce would be filed Mr. Davis filed a different financial statement showing a net worth of $190,258 is 'human nature,' 'logical,' and an 'opportunity to do a little pre-divorce planning,' violates public policy."

In June of 1988, Jay prepared a financial statement for the purpose of renewing an upcoming business loan. The financial statement listed Jay's net worth as $1,356,-650. On October 15, 1988, Jay prepared a financial statement in conjunction with the divorce. The October financial statement listed Jay's net worth as $190,258. The substantial majority of the change in net worth between the two financial statements related to an Arizona pecan farm investment. Jay and Geri had a 10 percent interest in 880 acres. On the June state-

ment, Jay listed the present value of the investment as $900,000. In reality, it is a tax shelter, which Geri acknowledged they were "basically stuck in." Jay could not even give it to Geri during the trial because of its negative value.[4] Jay testified that at the time of the preparation of the June financial statement, he was trying to get his Aamco Transmissions business on its feet and that he was attempting to put his best foot forward for financing purposes. He testified that he was not fully aware of the tax implications of his pecan farm investment, that he had not consulted any books or records when evaluating his Aamco Transmissions business, and that he had not consulted with his accountant. The trial court, in its oral findings said:

> "I don't, for instance, find any fault with what Mr. Davis did on June 30th of 1988 in a published financial report to the bank versus October of 1988 after he found out that he was going to be divorced. That's just human nature. That's something that's logical. I would expect that from people who are—who are faced with a divorce, a breakup of a marriage. He got the opportunity to do a little pre-divorce planning and he did it. And I just can't fault him for that. He was in a position to do it and so he did it."

As we have said, it is the function of the trial court to weigh the evidence and determine the credibility of the witnesses. The trial court, based upon the evidence it heard and observed, found that the values given in the October 1988 financial statements were accurate. Jay obviously engaged in some extraordinary puffing in the earlier financial statement which was designed to secure a note renewal. At the time, this was apparently designed for Jay and Geri's mutual benefit. It is something we do not commend him for but it does not prove that the trial court's findings of value as of the time of the divorce are clearly erroneous. It is those findings that are at issue in this lawsuit. As we have said before, we will not conclude that a trial court's findings are clearly erroneous unless we are convinced that a mistake has been made. *Heggen, supra*, 452 N.W.2d at 99; *Dinius v. Dinius*, 448 N.W.2d 210, 211 (N.D.1989).

In reviewing the findings in light of all of the evidence and consistent with the *Ruff–Fischer* factors,[5] including the losses in the pecan farm tax shelter, the debt to the family trust of about $172,000, the peculiar relationship of the value of the transmission business to Jay's personal skills and experience, that the seed money for the transmission business originally came

---

**4.** The pecan farm tax shelter in Arizona was initially listed in the property division as an asset to Jay in the amount of $55,000 and a liability to Jay in the amount of $46,200. Gene Gallagher, a certified public accountant, testified that the depreciation on the tax shelter was almost used up and that this would ultimately result in a greater tax liability for Jay. As the shelter's potential is more of a liability than an asset, Geri was apparently not interested in obtaining it in the property division.

Gallagher testified that in valuing the pecan farm, the income taxes that would be due on its sale, or if the interest was simply given back to the partnership, should be considered. Jay's negative capital account in the partnership, because of the losses and accumulated depreciation is $108,549. If Jay defaulted, he would have income equal to his negative capital account, which would be taxed on an effective rate of 40 percent. This would result in a tax liability of approximately $57,510. This negative capital account substantially affects the value of the pecan farm and could have been considered by the trial court to reduce the value

assigned to it. Jay listed its value in his October financial statement as approximately $115,000.

**5.** The *Ruff–Fischer* guidelines to be considered by a court in determining a fair and equitable property division are:

> "(a) the respective ages of the parties;
> "(b) the parties' earning abilities;
> "(c) the duration of the marriage and conduct of each of the parties during the marriage;
> "(d) the parties' station in life;
> "(e) the circumstances and necessities of each of the parties;
> "(f) the parties' health and physical condition;
> "(g) the parties' financial circumstances as shown by the property owned at the time of the marital dissolution, its value, its income-producing capacity (if any), and whether it was accumulated before or after the marriage; and
> "(h) other material matters.' "

*Lucy v. Lucy*, 456 N.W.2d 539, 541 (N.D.1990).

from Jay's family, the fault of the parties, particularly the non-economic fault admitted by Geri, that each of the parties has income sources either from employment or business, that during the marriage the parties shared in the child care responsibilities and household duties, that Jay will have the responsibility of providing the funds for the care and education of the children without financial contribution from Geri, we conclude that the findings of the trial court are not clearly erroneous. Accordingly, although we deny the motion to dismiss, we affirm the judgment with costs on appeal to Jay.

GIERKE and VANDE WALLE, JJ., and VERNON R. PEDERSON, Surrogate Justice, concur.

MESCHKE, J., concurs in the result.

VERNON R. PEDERSON, Surrogate Justice, sitting in place of LEVINE, J., disqualified.